499 S.E.2d 488

**James M. McNAIR and Victoria E. McNair, Appellants,**

**v.**

**John RAINSFORD, III, Ann Dudley Rainsford, and William H. Tucker, Respondents.**

**No. 2804.**

Court of Appeals of South Carolina.

Heard Feb. 3, 1998.

Decided March 2, 1998.

334

336

Palmer Freeman, Jr., of Suggs & Kelly, Columbia, for Appellants.

H. Flynn Griffin, III, of Anderson & Associates, Columbia, for Respondents John Rainsford, III and Ann Dudley Rainsford.

R. Davis Howser and Michael R. Sullivan, both of Howser, Newman & Besley, Columbia, for Respondent William H. Tucker.

ANDERSON, Judge:

James and Victoria McNair appeal from the special referee's order granting summary judgment to William H. Tucker, John Rainsford, III, and Ann Dudley Rainsford. We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL BACKGROUND

The McNairs owned a house at 305 Lancaster Street in Aiken, South Carolina. In addition to living in the house, the

McNairs operated it as a bed and breakfast inn. In 1989, the Rainsfords contacted the McNairs about purchasing the house. Negotiations were conducted by James McNair and John Rainsford. Their wives were not directly involved in the negotiations. McNair and Rainsford ultimately agreed to terms which they memorialized in a handwritten document.

Pursuant to the agreement reached by the two men, the McNairs would receive $264,000 in cash as well as two options on certain property in lieu of receiving in cash the remaining amount owed as consideration for the house. The McNairs paid $4000 for the options. The options provided the McNairs with rights to (1) six lots in the Cedar Creek Country Club, owned by a corporation, which was being developed by Rainsford, his brother, and two other men and (2) a twenty five percent interest in the McNair tract,[1] which Rainsford owned jointly with his brother. Unlike a normal option, the McNairs were not required to pay any further consideration in order to acquire the optioned property. They simply had to demand a deed. Under the terms of the Cedar Creek option, McNair could require Rainsford to pay cash instead of conveying the lots. The McNairs exercised this right and began receiving monthly payments from Rainsford in 1990. They received $3200 per month for a period of six months.

McNair asked William Tucker, a local attorney, to "take a look at" the rough draft of the agreement and prepare the necessary legal documents, such as the contract of sale, deed, and options, according to the agreement previously reached by McNair and Rainsford. Tucker had represented McNair on other matters. He prepared a will for McNair and did the closing on the residence at Lancaster Street when the McNairs purchased it in 1984. Rainsford did not want to hire a separate attorney, so he suggested to McNair that Tucker "can close it for both of us." However, Rainsford "thought [Tucker] was representing [McNair]" in the transaction. Rainsford viewed Tucker's role as one of "refin[ing] what [he and McNair] had agreed upon." Tucker had never represented Rainsford prior to this time.

Tucker met jointly with McNair and Rainsford. He agreed to reduce the handwritten notes outlining their agreement for

---

1. The McNairs had no prior interest in the "McNair tract."

the sale of the house to legally sufficient documents, i.e., the two options and contract of sale. The McNairs and the Rainsfords agreed to split Tucker's fee.

On August 7, 1989, all four parties signed the contract of sale. The contract provided a consideration of $264,000 [2] for the sale of the house. The contract further provided the McNairs agreed to sell the neighboring lot, known as Lot 41, for a consideration of $35,000.

The contract did not reference the land options. John Rainsford was the grantor of both options. The Cedar Creek option was signed by the McNairs and John Rainsford. The McNair tract option was signed only by James McNair and John Rainsford. Ann Rainsford was not a party to either option. The McNair tract option had a five year term, while the Cedar Creek option had staggered terms for each development phase.

The Rainsfords hired Alex Beasley to handle the closing, which occurred on November 1, 1989. The closing statement, which was signed by the McNairs and Ann Rainsford only, reflected a sales price of $264,000. The property was deeded to Ann Rainsford. Further, the McNairs conveyed title to Lot 41 to Ann Rainsford for the sum of $35,000. The land options were not recorded. McNair denied he told Tucker not to record the options due to capital gains tax concerns.

John Rainsford filed a petition for Chapter 11 bankruptcy on March 19, 1992. In his bankruptcy filings, Rainsford did not list the McNairs on any schedule of creditors. The Chapter 11 plan was confirmed on June 4, 1993. Rainsford's bankruptcy case was closed on October 4, 1993. According to McNair, Rainsford told him he would pay him despite the bankruptcy. However, Rainsford did not enter into a written reaffirmation agreement with the McNairs.

McNair admitted he was personally notified of the bankruptcy by Rainsford himself. "[S]ometime in the summer of 1992," Rainsford informed McNair he was filing for bankruptcy. McNair called Tucker to find out "where [he and his wife]

---

2. The $264,000 was itemized as follows: $25,000 paid as earnest money; $200,000 paid at the closing; $4000 value attributed to the options; and $35,000 promissory note payable on or before January 30, 1990.

stood." About a month after Rainsford informed McNair he was filing for bankruptcy, McNair spoke to Rainsford's bankruptcy attorney, Steven Romig. Romig offered to put McNair on the mailing list so he would receive "copies of the bankruptcy proceedings." He advised McNair he was an unsecured creditor and would receive approximately two cents on the dollar. At that time, McNair again called Tucker, who told him "[p]ossibly you should go ahead and file at least to have ... that you are a creditor." On October 5, 1992, McNair mailed a letter to Rainsford indicating his desire to execute the option on the McNair tract.

In 1993, Ann Rainsford sold the Lancaster Street property to Edwin and Mary Farmer for $475,000. Tucker handled the closing.

The McNairs filed a complaint alleging causes of action (1) against the Rainsfords for suit on a debt and breach of contract accompanied by a fraudulent act; (2) against Ann Rainsford individually for constructive trust; (3) against John Rainsford individually for breach of contract; and (4) against William Tucker for legal malpractice asserting he was negligent in his representation of them during the transaction. The matter was referred to a special referee for final judgment on any pretrial motions.

Tucker and the Rainsfords moved for summary judgment. The referee granted summary judgment to Tucker and found: "Tucker was engaged to 'paper the transaction' and act as scrivener of the transaction previously agreed upon by Plaintiff James McNair and Defendant John Rainsford. Tucker has breached no duty or standard of care owed to the [McNairs] which was a proximate cause of any damages sustained by [them]."

In granting summary judgment to John Rainsford, the referee held any indebtedness allegedly due the McNairs from John Rainsford was discharged by the bankruptcy. The referee also granted summary judgment to Ann Dudley Rainsford. The referee concluded there were no allegations of fraud against her and, therefore, no constructive trust could be imposed upon the funds she received from the subsequent sale of the residence to third parties. Because there were no allegations of fraud, the claim for breach of contract accompa-

nied by fraudulent act was barred. Finally, the referee ruled the Statute of Frauds barred recovery against Ann Rainsford as to the suit on a debt claim.

## ISSUES

I. Did the special referee err in granting summary judgment to William H. Tucker?

II. Did the special referee err in granting summary judgment to John Rainsford, III?˙

III. Did the special referee err in granting summary judgment to Ann Dudley Rainsford?

## STANDARD OF REVIEW

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Summer v. Carpenter*, 328 S.C. 36, 492 S.E.2d 55 (1997); Rule 56(c), SCRCP. *See also Standard Fire Ins. Co. v. Marine Contracting and Towing Co.*, 301 S.C. 418, 392 S.E.2d 460 (1990) (motion for summary judgment shall be granted if pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and moving party is entitled to judgment as matter of law). In determining whether any triable issue of fact exists, as will preclude summary judgment, the evidence and all inferences which can be reasonably drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Summer, supra. See also Bates v. City of Columbia,* 301 S.C. 320, 391 S.E.2d 733 (Ct.App.1990) (in determining whether to grant summary judgment, pleadings and documents on file must be liberally construed in favor of nonmoving party who must be given benefit of all favorable inferences that might reasonably be drawn from record). If triable issues exist, those issues must go to the jury. *Rothrock v. Copeland,* 305 S.C. 402, 409 S.E.2d 366 (1991).

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Tupper v. Dorchester County,* 326 S.C. 318, 487 S.E.2d 187 (1997); *Baugus v. Wessinger,* 303 S.C. 412, 401 S.E.2d 169 (1991). Even when there is no dispute as to

evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Tupper, supra.* However, when plain, palpable, and indisputable facts exist on which reasonable minds cannot differ, summary judgment should be granted. *Trico Surveying, Inc. v. Godley Auction Co.,* 314 S.C. 542, 431 S.E.2d 565 (1993); *Rothrock, supra.* All ambiguities, conclusions, and inferences arising from the evidence must be construed most strongly against the movant. *True v. Monteith,* 327 S.C. 116, 489 S.E.2d 615 (1997); *Tupper, supra.*

The party seeking summary judgment has the burden of clearly establishing the absence of a genuine issue of material fact. *Baughman v. American Tel. and Tel. Co.,* 306 S.C. 101, 410 S.E.2d 537 (1991); *Standard Fire Ins. Co., supra.* With respect to an issue upon which the nonmoving party bears the burden of proof, this initial responsibility may be discharged by showing the trial court there is an absence of evidence to support the nonmoving party's case. *Baughman, supra.* The moving party need not support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Because it is a drastic remedy, summary judgment should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues. *Id.*

## *LAW/ANALYSIS*

### I. *LEGAL MALPRACTICE CLAIM AGAINST WILLIAM TUCKER*

The McNairs aver the special referee erred in granting summary judgment to Tucker as to the cause of action for legal malpractice. We agree.

In an action for legal malpractice, the claimant must prove four elements: (1) the existence of an attorney-client relationship; (2) breach of a duty by the attorney; (3) damage to the client; and (4) proximate causation of the client's damages by the breach. *Smith v. Haynsworth, Marion, McKay & Geurard,* 322 S.C. 433, 472 S.E.2d 612 (1996). A plaintiff in a legal malpractice action must generally establish the standard of care by expert testimony. *Id.* The McNairs submitted an affidavit from C. Joseph Roof, a real estate

closing expert. Roof reviewed the pleadings, depositions, and exhibits in the case. He identified nine instances where he felt Tucker breached the duty and standard of care generally required of a reasonably competent attorney.

Roof's affidavit cites to several of the Rules of Professional Conduct which he asserts were violated by Tucker in his representation of the McNairs. The failure of an attorney to comply with a Rule of Professional Conduct is not evidence of negligence *per se*. *Id.* It is merely a circumstance that, along with other facts and circumstances, may be considered in determining whether the attorney acted with reasonable care in fulfilling his legal duties to a client. *Id.*

## A. Attorney–Client Relationship

Before a claim of professional malpractice may be asserted, an attorney-client relationship must exist. *American Federal Bank, FSB v. Number One Main Joint Venture,* 321 S.C. 169, 467 S.E.2d 439 (1996). Here, there is a factual dispute as to whether an attorney-client relationship existed between Tucker and the McNairs.

McNair testified:

We brought [the agreement] to Mr. Tucker, I asked [Tucker] to close the sale for me. I assumed he was representing my interests. When [Tucker] drew these up, [he] expressed no problems whatsoever in any of this paperwork.... I thought that if anything would—any red flags or any problems with these option agreements, with this contract, [Tucker] would have called me and said, 'Listen, maybe you ought to do something different than these options,' but it was never discussed.

. . . .

I also asked him to represent me as my attorney, and obviously, I need to ask him, instead of assuming, that he was going to protect my interests.

. . . .

He's represented me before that time, and then I came to him and asked him to represent me as my attorney to close this sale, and he accepted.

Tucker had represented McNair on various other matters over the years. Rainsford stated he "thought [Tucker] was representing [McNair]" in the transaction. The Rainsfords hired Alex Beasley to represent them at the closing. According to Tucker, he "represented [the McNairs] in several real estate transactions, one of them being the subject matter of this litigation."

## B. Dual Representation

■ An attorney who represents more than one client must be cognizant of the vicissitudes of dual representation. Dual representation is not *per se* unethical, but raises the spectre of a violation of Rules 1.7 and 2.2 of the South Carolina Rules of Professional Conduct (RPC), Rule 407, SCACR. Rule 1.7 addresses conflict of interest and provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) Each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

■ Conflicts of interest in non-litigation contexts may sometimes be difficult to assess. Rule 1.7 cmt. at p. 139, Rule 407, SCACR. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the

likelihood actual conflict will arise, and the likely prejudice to the client from the conflict if it does arise. *Id.*

The Ethics Advisory Committee of the South Carolina Bar has provided guidance as to whether an attorney may represent the Buyer, the Seller, and the Lender at a real estate closing. The lawyer informed the Committee he may be retained to perform legal service in the formation of a Sub-Chapter S Corporation which will purchase land to develop into a residential subdivision. The attorney's wife and a builder will be two of the corporate investors. Some of the homes might be purchased directly from the Corporation, and others will be purchased from the builder. In Opinion No. 94-08, the Committee concluded an attorney may represent all three parties to a real estate closing without violation of the RPC provided, however, no negotiation is required, no problem has arisen which may jeopardize the closing, no party is relying on the attorney for substantive advice about how or whether to proceed, there has been full disclosure of the potential for conflict to all the parties to the closing, all of the parties understand their right to seek other legal counsel, and all parties agree. Additionally, the attorney must reasonably believe the representation will not adversely affect any part of the closing.

The Committee further explained:

[T]he simultaneous representation of multiple parties at a real estate closing does not create an impermissible conflict of interest.

It is clear that in real estate transactions the Purchaser, Seller, and Lender often have competing, if not directly conflicting interests. Each party has a need for legal advice about the nature of the transaction and the legal relationship it will create and effect. Yet it is also clear that the parties have a unified interest in consummation of the transaction.

The general rule concerning simultaneous representation of parties should be used as a guideline in concluding whether or not there is an impermissible conflict of interest in any real estate closing. This general rule ... is Rule 1.7(b). ...

In this factual scenario, provided the lawyer gives full disclosure to all the parties concerning his relationship with the Corporation and his wife's investment in the Corporation, and all the parties consent after such consultation, there is no ethical prohibition against the described multiple representation.... We conclude that as long as the lawyer is employed simply to perform the ministerial acts associated with real estate closings, there is no conflict of interest and thus no breach of Rule 1.7. However, if any negotiation is required on behalf of any of the parties, or if any party is relying on the lawyer for substantive advice about how or whether to proceed, our analysis would very well lead to a different conclusion.

■ "While in many situations an attorney's representation of both a buyer and seller in a real estate transaction may create a conflict of interest, ... if the parties have already agreed on the basic terms of the agreement and the attorney acts primarily as a 'scrivener' he may normally represent both parties *after obtaining their consent." Beal v. Mars Larsen Ranch Corp.,* 99 Idaho 662, 586 P.2d 1378, 1384 (1978) (emphasis added).

Our Supreme Court examined a conflict of interest scenario in *In re Trexler,* 327 S.C. 315, 491 S.E.2d 257 (1997). Trexler represented Henry Thomason and Eugene Makovitch in an action which had been brought against them by the plaintiff, who had been attacked by several dogs. Thomason and Makovitch each owned a dog involved in the attack. Trexler was retained first by Thomason, and then by Makovitch. Thomason stated Trexler did not discuss the potential for a conflict of interest as a result of Trexler's joint representation of Thomason and Makovitch. Trexler advised both clients they would be liable. A settlement was negotiated, and both signed a confession of judgment for $20,000. After supplemental proceedings on the judgment were instituted, Makovitch settled for $3000 and a tract of land.

A complaint was filed against Trexler alleging he violated Rule 1.7(a) of the RPC, Rule 407, SCACR. The Supreme Court noted although the complaint alleged a violation of subpart (a) of Rule 1.7, it appeared subpart (b) was more relevant. The Court concluded there could have been a

conflict of interest between the clients given the fact both had dogs in the attack. The Court explained the proper course would have been for Trexler to obtain the clients' consent before jointly representing them. However, the Court determined it did not appear the clients were prejudiced as a result of the joint representation, as favorable settlements were ultimately secured for both. For this and other transgressions, Trexler was publicly reprimanded.

Rule 2.2 of the RPC sets out when an attorney may act as an intermediary:

(a) A lawyer may act as intermediary between clients if:

(1) The lawyer consults with each client concerning the implications of the common representation, including the advantages and risks involved, and the effect on the attorney-client privileges, and obtains each client's consent to the common representation;

(2) The lawyer reasonably believes that the matter can be resolved on terms compatible with the clients' best interests, that each client will be able to make adequately informed decisions in the matter and that there is little risk of material prejudice to the interests of any of the clients if the contemplated resolution is unsuccessful; and

(3) The lawyer reasonably believes that the common representation can be undertaken impartially and without improper effect on other responsibilities the lawyer has to any of the clients.

(b) While acting as intermediary, the lawyer shall consult with each client concerning the decisions to be made and the considerations relevant in making them, so that each client can make adequately informed decisions.

■ A lawyer acts as intermediary under Rule 2.2 when the lawyer represents two or more parties with potentially conflicting interests. Rule 2.2 cmt. at p. 163, Rule 407, SCACR. A key factor in defining the relationship is whether the parties share responsibility for the lawyer's fee, but the common representation may be inferred from other circumstances. *Id.* Because confusion can arise as to the lawyer's role where each party is not separately represented, it is important the lawyer make clear the relationship. *Id.*

█ Since the lawyer is required to be impartial between commonly represented clients, intermediation is improper when that impartiality cannot be maintained. Rule 2.2 cmt. at p. 165, Rule 407, SCACR. For example, a lawyer who has represented one of the clients for a long period and in a variety of matters might have difficulty being impartial between that client and one to whom the lawyer has only recently been introduced. *Id.*

█ In acting as intermediary between clients, the lawyer is required to consult with the clients on the implications of doing so, and proceed only upon consent based on such a consultation. *Id.* The consultation should make clear that the lawyer's role is not that of partisanship normally expected in other circumstances. *Id.* Where the lawyer is intermediary, the clients ordinarily must assume greater responsibility for decisions than when each client is independently represented. *Id.*

### C. Scrivener

Tucker contends he was a scrivener for the transaction. In order for the scenario to involve scrivener activity, it is necessary to examine the law in this state in regard to scriveners. This Court referred to a lawyer as a "scrivener" in *Hellams v. Harnist,* 284 S.C. 256, 325 S.E.2d 569 (Ct.App. 1985). In *Hellams,* attorney Thomas A. Babb prepared a deed conveying certain property from Hellams to the Harnists. Hellams brought an action against the Harnists for reformation of the deed. Hellams alleged and the trial court impliedly found the attorney who drew the deed mistakenly included the second paragraph of the description and the parties to the transaction did not intend for the deed to convey all of Hellams' property. This Court reversed and held: "[W]e conclude and hold that the *scrivener* did not mistakenly add the last paragraph to the deed description; it was intentionally inserted." *Hellams,* 284 S.C. at 259, 325 S.E.2d at 571 (emphasis added). The *Hellams* case is not dispositive because the Court did not define nor did it analyze the role of scrivener.

A scrivener is a "writer; scribe; conveyancer. One whose occupation is to draw contracts, write deeds and mortgages,

and prepare other species of written instruments." *Black's Law Dictionary* 1347 (6th ed. 1990). Scrivener has also been defined as a draftsman or copyist. *Webster's New Twentieth Century Dictionary* 1631 (2d ed. 1983).

### D. Proximate Cause

 In a negligence action, the plaintiff must prove proximate cause. *Vinson v. Hartley,* 324 S.C. 389, 477 S.E.2d 715 (Ct.App.1996). Negligence is not actionable unless it is a proximate cause of the injury. *Id.* Proof of proximate cause requires proof of both causation in fact and legal cause. *Id.* Causation in fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence. *Id.* Legal cause is proved by establishing foreseeability. *Id.* A plaintiff therefore proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's negligence. *Id.*

 Proximate cause is the efficient or direct cause of an injury. *Id.* Negligence is deemed to be the proximate cause of an injury when, without such negligence, the injury would not have occurred or could have been avoided. *Id.* Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence. *Id.*

 A question of fact was presented in regard to the proximate cause of McNair's damages due to the failure to record the options. According to Tucker:

> There was an additional concern that I had on recording these, particularly the Cedar Creek option ... and that was that it was a blanket option on the whole development where, if I were a title checker for somebody else who was getting ready to buy a lot in Cedar Creek development, I would have to find Mr. McNair and get a waiver of his right to purchase on every lot that was sold out there. It would have caused a pilgrimage to Jim McNair every time somebody wanted to buy a lot.

This is exactly the type of action that would have protected McNair's interest.

### E. Error in Granting Summary Judgment on Legal Malpractice

Based on Rules 1.7 and 2.2 of the Rules of Professional Conduct, Rule 407, SCACR, the affidavit of C. Joseph Roof, and the testimonies of McNair, Rainsford, and Tucker, we conclude factual issues exist in regard to the legal malpractice claim against Tucker. It was error for the Special Referee to resolve the factual matters under the aegis of a summary judgment motion. We remand to the Circuit Court for a trial on this cause of action.

## II. *CLAIMS AGAINST JOHN RAINSFORD, III*

The McNairs argue the special referee erred in granting Rainsford's motion for summary judgment. They maintain the debts owed to them were excepted from the discharge in bankruptcy. We disagree.

Rainsford's Plan of Reorganization was confirmed on June 4, 1993. "[T]he confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A) (1993). Yet, "[t]he confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under section 523 of this title." 11 U.S.C. § 1141(d)(2) (1993).

Pursuant to 11 U.S.C. § 523(a) (1993 & Supp.1997):

(a) A discharge under section ... 1141 ... does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

However, debts which arise under § 523(a)(2), (4), and (6) are discharged unless the creditor brings an action to determine dischargeability in the bankruptcy court. 11 U.S.C. § 523(c)(1) (Supp.1997). Section 523(c)(1) provides as follows:

Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), (6), or (15) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), (6), or (15), as the case may be, of subsection (a) of this section.

Rainsford filed his bankruptcy petition on March 19, 1992. The McNairs have never filed a request that the Bankruptcy Court determine dischargeability of the debt as required by § 523(c)(1). As a result, unless the McNairs satisfied the requirements of § 523(a)(3)(B), Rainsford "shall be discharged" from the debts.

The McNairs claim they were not required to contest dischargeability in the Bankruptcy Court. They maintain state courts have concurrent jurisdiction to determine the dischargeability issues in this case. The bankruptcy courts have exclusive jurisdiction to determine certain dischargeability exceptions, including the exceptions for fraud. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). In *Brown,* the Court explained:

Traditionally, the bankruptcy court determined whether the debtor merited a discharge under § 14, but left the dischargeability under § 17 of a particular debt to the court in which the creditor sued, after bankruptcy, to enforce his prior judgment. Typically, that court was a state court. In 1970, however, Congress altered § 17 to require creditors to apply to the bankruptcy court for adjudication of certain dischargeability questions, including those arising under §§ 17(a)(2) and 17(a)(4).

*Brown,* 442 U.S. at 129–30, 99 S.Ct. at 2208, 60 L.Ed.2d at 770.[3]

---

3. In 1978, Congress repealed the Bankruptcy Act, effective October 1, 1979. *See Brown, supra.* Discharge provisions substantially similar to § 17 of the Bankruptcy Act appear in § 523 of the new law. *See* 11

In *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court, in a footnote, discussed the shift of dischargeability proceedings from state courts to bankruptcy courts:

> Before 1970, the bankruptcy courts had concurrent jurisdiction with the state courts to decide whether debts were excepted from discharge. In practice, however, bankruptcy courts generally refrained from deciding whether particular debts were excepted and instead allowed those questions to be litigated in the state courts. *See Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); ... The 1970 amendments took jurisdiction over certain dischargeability exceptions, including the exceptions for fraud, away from the state courts and vested jurisdiction exclusively in the bankruptcy courts.

*Grogan,* 498 U.S. at 284 n. 10, 111 S.Ct. at 658 n. 10, 112 L.Ed.2d at 763 n. 10. Clearly, as a result of the 1970 amendments, dischargeability exceptions arising from fraud are exclusively within the jurisdiction of the bankruptcy court. The Circuit Court does not have jurisdiction to determine dischargeability under § 523(a)(2), (4), or (6).

The McNairs' reliance on *In re Brabham,* 184 B.R. 476 (Bankr.D.S.C.1995),[4] to establish concurrent jurisdiction is misplaced. *Brabham* involves the nondischargeability of debts in the nature of alimony, maintenance, or support obligations pursuant to 11 U.S.C. § 523(a)(5) (1993). Because such debts are not involved in this case, *Brabham* is not applicable.

Finally, because the McNairs did not satisfy the requirements of § 523(a)(3)(B), Rainsford was discharged from the debts he owed to them. According to 11 U.S.C. § 523(a)(3)(B)

---

U.S.C. § 523 (1993 & Supp.1997). Sections 17(a)(2) and (4) are substantially similar to § 523(a)(2), (4), and (6).

**4.** *Brabham, supra,* held bankruptcy and state domestic relations courts have concurrent jurisdiction over issues regarding the nondischargeability of a debt as allegedly being in the nature of an "alimony, maintenance or support" obligation, pursuant to § 523(a)(5). The *Brabham* court further found it appropriate for bankruptcy courts to avoid incursions into family law matters out of considerations of court economy, judicial restraint, and deference to state courts and to their established expertise in such matters.

(1993 & Supp.1997), a discharge under § 1141 does not discharge an individual debtor from any debt—

neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

. . . .

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

In *In re Alton*, 837 F.2d 457 (11th Cir.1988), the Eleventh Circuit discussed the efficacy of § 523(a)(3)(B):

Section 523(a)(3)(B) specifically provides that when a debtor fails to list those debts incurred fraudulently or incurred because of malicious injury to another or lists them too late to allow a creditor to file a proof of claim and a dischargeability complaint in [a] timely manner, then those debts will be undischarged "unless such creditor had notice or actual knowledge *of the case* in time for such timely filing and request." ... The statutory language clearly contemplates that mere knowledge of a pending bankruptcy proceeding is sufficient to bar the claim of a creditor who took no action, whether or not that creditor received official notice from the court of various pertinent dates. This furthers the bankruptcy policy of affording a "fresh start" to the debtor by preventing a creditor, who knew of a proceeding but who did not receive formal notification, from standing back, allowing the bankruptcy action to proceed without adjudication of his claim, and then asserting that the debt owed him is undischargeable.

*Alton*, 837 F.2d at 460 (emphasis in original) (footnote omitted).

In *In re Green*, 876 F.2d 854 (10th Cir.1989), the Tenth Circuit Court of Appeals was faced with the question whether a creditor who does not receive formal notice of the filing of a petition for bankruptcy relief under Chapter 7, but who has actual knowledge shortly after the filing, is bound by the bar date for filing complaints to determine dischargeability. Yu-

kon, the creditor, asserted a claim in state court against Green, the debtor. While Yukon was seeking sanctions against Green for failure to respond to discovery, Green filed a petition for relief under Chapter 7 of the Bankruptcy Code. Green did not list Yukon as a creditor, but he did list another creditor from whom Yukon's alleged debt arose. Because Yukon was not separately scheduled, it did not receive a formal notice of the filing and the meeting of creditors.

Despite the failure of formal notice, Yukon learned of Green's petition before the September 2, 1986, bar date for the filing of complaints to determine dischargeability. In a hearing conducted in the bankruptcy court, Yukon's general partner testified he received copies of Green's bankruptcy papers from his attorney sometime in August 1986. In addition, the time sheets of Yukon's counsel disclosed a billing statement for "research regarding bankruptcy motion to debtor" on August 11, 1986, and for research on the 26th and 27th of August concerning dischargeability of Green's debt. The instant complaint was prepared by counsel on August 29, 1986, but for some unexplained reason, its filing was delayed until September 4, 1986, two days after the bar date. On the basis of these facts, the bankruptcy court found Yukon had actual timely notice of the filing and the bar date and dismissed Yukon's complaint. The district court refused to overturn the finding and pointed out 11 U.S.C. § 523(a)(3)(A) contemplates the debt of a creditor with actual knowledge of the bankruptcy case in time for timely filing of a proof of claim will be discharged notwithstanding failure of formal notice. The court reasoned the Code clearly contemplates actual notice of a bar date received in time to file a complaint to determine dischargeability will foreclose an untimely complaint. The Circuit Court affirmed the District Court and held:

> [B]ecause of the specific language of § 523(a)(3)(A) allowing discharge of the debt of a creditor with actual, timely notice, a Chapter 7 creditor holding an unsecured claim does *not* have the "right to assume" receipt of further notice. When a creditor receives notice of a bar date in time sufficient to act, the requirement of due process is satisfied. . . .
>
> Standing on the formality of notice from the court will not excuse a creditor with actual notice of a bar date from its

effect. Indeed, a Chapter 7 creditor with such notice has a duty to protect itself from being adversely affected.

*In re Green,* 876 F.2d at 857 (emphasis in original) (footnote omitted).

██ James McNair admitted Rainsford personally informed him "he was going to have to file Chapter 11 bankruptcy." Approximately one month after Rainsford informed McNair he was filing for bankruptcy, McNair called Steven Romig, Rainsford's bankruptcy attorney, and discussed the proceeding. Romig offered to put McNair on the mailing list so he would receive "copies of the bankruptcy proceedings." At that time, McNair called Tucker, who told him "[p]ossibly you should go ahead and file at least to have . . . that you are a creditor." Clearly, the McNairs had "actual knowledge of the case." If the McNairs, once warned of the bankruptcy proceeding, had made a minimal effort to determine the date of the filing of the petition, they would have realized the outside dates for the filing of a complaint contesting the dischargeability of their claim or for a motion to extend such time. Instead, the McNairs made no such effort. Section 523(a)(3)(B) explicitly places a burden on creditors with knowledge of bankruptcy proceedings to act to protect their rights. The McNairs did not file an objection to the dischargeability of their claims. Consequently, any claims they may have had were discharged.

██ In their brief, the McNairs argued that before, during, and after his bankruptcy, Rainsford repeatedly promised to repay the McNairs despite the bankruptcy. However, Rainsford did not enter into a formal written reaffirmation agreement with the McNairs. Pursuant to 11 U.S.C. § 524(c) (1993 & Supp.1997), in order to properly reaffirm a previously discharged debt, certain requirements must be fulfilled:

(1) the agreement must be made prior to discharge;

(2) the agreement must advise the debtor of rescission rights;

(3) the agreement must be filed with the court;

(4) the agreement must not have been timely rescinded by the debtor; and

(5) in a case concerning a debtor who was not represented by an attorney during the course of negotiating an agreement, the court must approve such agreement as not imposing an undue hardship on the debtor and in the best interest of the debtor.

The detailed requirements of § 524(c) were not satisfied in the case *sub judice*. Therefore, we determine there was no reaffirmation agreement in existence.

### III. *CLAIMS AGAINST ANN DUDLEY RAINSFORD*

The McNairs contend the special referee erred in granting summary judgment to Ann Rainsford as to the constructive trust cause of action. Additionally, the McNairs aver the Statute of Frauds did not bar recovery against Ann Rainsford.

### A. Constructive Trust

According to the McNairs, because John Rainsford engaged in fraudulent acts concerning the land options, a constructive trust should be imposed on the proceeds Ann Rainsford received for the sale of the Lancaster Street property to the Farmers. They maintain "it would be inequitable for John Rainsford to use his wife as a pseudo-agent of his fraudulent activity and for her to retain the benefits from [the fraudulent activity]."

A constructive trust arises entirely by operation of law without reference to any actual or supposed intentions of creating a trust. *SSI Medical Servs., Inc. v. Cox*, 301 S.C. 493, 392 S.E.2d 789 (1990). It is resorted to by equity to vindicate right and justice or frustrate fraud. *Whitmire v. Adams*, 273 S.C. 453, 257 S.E.2d 160 (1979). "A constructive trust arises whenever a party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it as where money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust or the violation of a fiduciary duty." *SSI Medical Servs.*, 301 S.C. at 500, 392 S.E.2d at 793–94. *See also Lollis v. Lollis*, 291 S.C. 525, 354 S.E.2d 559 (1987) (constructive trust will arise whenever circumstances under which property was acquired make it inequitable that property

should be retained by one holding legal title); *Dye v. Gainey,* 320 S.C. 65, 463 S.E.2d 97 (Ct.App.1995) (constructive trust results from fraud, bad faith, abuse of confidence, or violation of fiduciary duty which gives rise to obligation in equity to make restitution). Generally, fraud is an essential element giving rise to a constructive trust, although it need not be actual fraud. *Lollis, supra; Whitmire, supra.* In order to establish a constructive trust, the evidence must be clear and convincing. *SSI Medical Servs., supra.*

■ The McNairs do not allege Ann Rainsford committed any fraud or fraudulent acts. They have failed to present any evidence of the circumstances necessary to establish a constructive trust.

The McNairs maintain Ann Rainsford received the benefit of the options. The record does not support that argument. The options indicate the consideration for them was paid to John Rainsford, not Ann Rainsford. She did not sign the options. Further, Ann Rainsford paid the full consideration stated in the contract of sale and closing statement for the residence. The closing statement does not indicate she received a $4000 credit for the options. Because Ann Rainsford received no benefit, there can be no constructive trust.

### B. Statute of Frauds

The McNairs argue the special referee erred in applying the Statute of Frauds when granting summary judgment as to the cause of action for suit on a debt. They further contend their claim is taken out of the "performed within the space of one year" requirement of the Statute of Frauds because they completed performance by paying $4000 for the options and selling their home to the Rainsfords.

South Carolina Code Ann. § 32–3–10 (Rev.1991) provides in pertinent part:

No action shall be brought whereby:

. . . .

(4) To charge any person upon any contract or sale of lands, tenements or hereditaments or any interest in or concerning them; or

(5) To charge any person upon any agreement that is not to be performed within the space of one year from the making thereof;

Unless the agreement upon which such action shall be brought or some memorandum or note thereof shall be in writing and signed by the party to be charged therewith or some person thereunto by him lawfully authorized.

■ Ann Rainsford is not liable for the options. She is protected by the Statute of Frauds. Although the options were in writing, they were not signed by Ann Rainsford, "the party to be charged therewith." John Rainsford signed the options. The only documents Ann Rainsford signed were the contract of sale and the closing statement.

Furthermore, the McNairs maintain their claim is taken out of the "performed within the space of one year" requirement because they partially performed by paying $4000 and Ann Rainsford retained benefits from the options. The record does not support the assertion Ann Rainsford was paid the $4000 for the options. On the contrary, the options indicate the $4000 was paid to John Rainsford. Ann Rainsford did not sign the options. Further, she fully complied with the terms of the contract for sale of the residence. There are no other documents signed by Ann Rainsford promising to pay anything to the McNairs.

## C. Breach of Contract Accompanied by a Fraudulent Act

The McNairs claim Ann Rainsford was a party to the breach of contract accompanied by a fraudulent act and that the referee erred in granting summary judgment to Ann Rainsford as to this cause of action. We disagree.

■ In their complaint, the McNairs allege various fraudulent acts committed by John Rainsford. However, they do not specifically plead any fraudulent acts committed by Ann Rainsford. To recover for breach of contract accompanied by a fraudulent act, a plaintiff must prove, *inter alia,* a fraudulent act accompanying the breach. *See Lister v. Avis Rent A Car Systems, Inc.,* 329 S.C. 133, 494 S.E.2d 449 (1997). Moreover, pursuant to Rule 9(b), SCRCP, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Because the

McNairs have neither alleged nor offered any evidence Ann Rainsford is guilty of fraudulent acts, the special referee did not err in granting summary judgment as to the cause of action for breach of contract accompanied by a fraudulent act.

## CONCLUSION

The special referee erred in granting summary judgment to William Tucker as to the cause of action for legal malpractice. The special referee did not err, however, in granting summary judgment to John Rainsford and Ann Dudley Rainsford. Accordingly, the referee's order as to Tucker is reversed and the orders as to John Rainsford and Ann Rainsford are affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HUFF, J., concurs.

HOWARD, J., concurs in part and dissents in part in separate opinion.

HOWARD, Judge:

I concur with the majority's opinion except as to the McNairs' constructive trust cause of action against Ann Rainsford. The majority affirms the special referee's grant of summary judgment to Ann Rainsford as to the constructive trust cause of action. I respectfully dissent.

The McNairs' failure to allege fraud on the part of Ann Rainsford does not preclude an action for constructive trust as the majority insists. The majority seems to suggest that in order to establish a constructive trust based on fraud, the defendant who currently holds the property or money sought must have himself acquired the property or money through fraud. This rationale is a far too narrow reading of South Carolina law.

The application of the equitable remedy of constructive trust is far reaching. Its limits are circumscribed only by "the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v. Father Divine*, 299 N.Y. 22, 85 N.E.2d 168, 170 (1949). It "is the formula through which the conscience of equity finds

expression." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380 (1919) (Cardozo, J.). "[T]he forms and varieties of constructive trusts are practically without limit, such trusts being raised, broadly speaking, whenever necessary to prevent injustice." *Dominick v. Rhodes*, 202 S.C. 139, 149, 24 S.E.2d 168, 173 (1943).

South Carolina courts often describe the law of constructive trust in vague terms because "equity is less than demanding and quite flexible in prescribing the elements essential to a constructive trust." *Whitmire v. Adams*, 273 S.C. 453, 458, 257 S.E.2d 160, 163 (1979). "A constructive trust arises whenever a party has obtained money which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it as where money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust or the violation of a fiduciary duty." *SSI Medical Servs., Inc. v. Cox*, 301 S.C. 493, 500, 392 S.E.2d 789, 793–94 (1990). "A constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title." *Lollis v. Lollis*, 291 S.C. 525, 529, 354 S.E.2d 559, 561 (1987). Constructive trusts are "resorted to by equity to vindicate right and justice or frustrate fraud." *Whitmire*, 273 S.C. at 457, 257 S.E.2d at 163.

None of the constructive trust rules seem to prevent the use of the constructive trust remedy where the defendant obtained property through another's fraud but did not himself commit the fraud. Instead, constructive trusts should be used, "broadly speaking, whenever necessary to prevent injustice." *Dominick*, 202 S.C. at 149, 24 S.E.2d at 173. "[U]nder the constructive trust theory, equity may collect proceeds from an innocent party in order to protect the equitable rights of those who have suffered the wrong." 76 AM.JUR.2D *Trusts* § 201 (1992). At least one academic has commented, "the sweep of unjust enrichment is broad enough so that a constructive trust may also be imposed against an innocent party, provided that the innocent party would be unjustly enriched vis-a-vis the plaintiff." Howard W. Brill, *Equity and the Restitutionary Remedies: Constructive Trust, Equitable Lien, and Subrogation*, 1992 ARK.L.NOTES 1, 5.

Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. It "is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." *Tupper v. Dorchester County*, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997). Furthermore, summary judgment is a drastic remedy that should be cautiously invoked so that no person will be improperly deprived of a trial of the disputed factual issues. *Baughman v. American Tel. & Tel. Co.*, 306 S.C. 101, 410 S.E.2d 537 (1991).

In this case, the McNairs' failure to allege fraud on the part of Ann Rainsford is not dispositive. At the least, it is unclear how South Carolina law regarding constructive trusts would apply to the facts alleged by the McNairs. Therefore, Ann Rainsford cannot be entitled to a judgment as a matter of law. Further inquiry into the facts in this case is required to determine the application of the law.

For the foregoing reasons, I would reverse the special referee's grant of summary judgment to Ann Rainsford as to the constructive trust cause of action.