THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS 
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Thomas Construction Services, Inc., Plaintiff,
v.
Rocketship Properties, II, LLC and Liberty Mutual Insurance Company,
Defendants.
Rocketship Properties, II, LLC, Third-Party Plaintiff/Appellant,
v.
Lincoln Harris, LLC and Thomas Causey, Third-Party Defendants/Respondents.
 
 
 

Appeal From Richland County
 G. Thomas Cooper, Jr., Circuit Court Judge

Unpublished Opinion No. 2006-UP-315
Heard May 9, 2006  Filed August 3, 2006   

AFFIRMED

 
 
 
Charles E. Carpenter, Jr., Franklin J. Smith, Jr. and Carmen V. Ganjehsani, all of Columbia; and W.H. Bundy, Jr., of Mt. Pleasant, for Appellant.
Henry W. Brown and Lawrence C. Melton, both of Columbia, for Respondents.
 
 
 

PER CURIAM: Rocketship Properties, II, LLC, brought a third-party complaint against Lincoln Harris, LLC and Thomas Causey, seeking damages resulting from an alleged breach of contract, breach of fiduciary duty, and negligent misrepresentation.  Rocketship appeals the trial courts order finding Lincoln Harris and Causey were not liable for Rocketships damages.  We affirm.
FACTS
Rocketship was formed by partners in the law firm of McAngus, Goudelock, & Courie, LLC (MG&C).  Rocketship sought to purchase property and construct office space, which would then be leased to MG&C.  On August 14, 2000, after consulting with Danville Business Advisors, Rocketship signed a contract to purchase property at 1221 Blanding Street in Columbia, formerly the Tapps Furniture Warehouse.  Rocketship did not close on the property until December 15, 2000.
Danville prepared pro forma statements of potential construction costs and lease revenues for buildings of various square footage.  All of the pro formas utilized above market rental rates.  In addition, the property would be purchased subject to a parking lease to allow the residents of the Tapps Apartments to use parking spaces from 6:00 p.m. until 8:00 a.m. 
Rocketship contacted Jubal Early at Lincoln Harris, a commercial development firm, to review the property and provide his opinion regarding development.  On September 27, 2000, Early forwarded to Rocketship a proposal to provide project management services.  The proposal specified Lincoln Harris would, among other services:  define the scope of the project, hire the architect, provide cost estimating, hold regular meetings prior to construction with Rocketship to review costs and schedule, award the contract to a general contractor, and control project costs.  The proposal also included some costs for development of a building suitable only for MG&Cs needs.  This portion of the project was handled by ESD, Inc., the architects brought on by Lincoln Harris.
In October 2000, Thomas Causey, the representative of Lincoln Harris assigned to the project, took the members of Rocketship on a tour of several sites developed by Lincoln Harris.  The sites were examples of prior-use buildings being converted into office space.  In addition, by letter dated October 20, 2000, Causey specifically recommended Rocketship increase the size of its building from 17,000 to approximately 27,000 square feet in order to decrease the cost per square foot as well as the rent to be owed by MG&C to Rocketship in the lease. 
A Work Letter dated October 23, 2000, contains the only agreement between Rocketship and Lincoln Harris.  The letter states This Work Letter, once executed by you, will serve as notice for us to proceed with implementation of the schematic design through ESD and the implementation of the Project Management Master Agreement that is attached.  The letter further noted: As discussed, Lincoln Harris will be responsible for managing the activities of ESD.  Finally, the letter set forth the fee arrangement and was signed by Causey on behalf of Lincoln Harris, and Jay Courie on behalf of MG&C.  After the Work Letter was signed, Causey acted as project manager on behalf of Lincoln Harris.
Causey introduced the members of Rocketship to Clay Elder, a principal in ESD, who would serve as the architect for the project.  In addition, Causey brought Jeff Thomas of Thomas Construction Services into the project to serve as general contractor.   
In December 2000, Thomas Construction presented Rocketship with an interim construction contract based upon a conceptual budget of $3 million.  The contract further stipulated that as the drawings were developed, a more detailed cost would be ascertained.  Pursuant to the interim contract, Thomas began demolition work on the old Tapps building.  A subsequent proposal included a parking garage for $3.5 million for a total budget of $7 million. 
On March 20, 2001, Causey and Thomas held a phone conference with James R. Goudelock, a partner in MG&C and Rocketship.  During the conference, Goudelock took notes to memorialize the discussion.  The notes indicate the parties agreed upon a 29,550 square foot building for a price of $3.1 million.  The notes do not indicate whether specific designs, finishes, or materials were discussed.
On March 28, 2001, Thomas sent another construction contract to Rocketship.  The contract included the following provisions:

. . . .
3.1     Subject to additions and deductions by the Change Order, the Contract Sum is:  Building - $3,100,000.00 Three Million One Hundred Thousand and no/100 dollars.  Project Conceptual Budget (see Attachment B-2). 
. . . . 
Article 6     Scope of Work is not outlined to date by drawings, etc.  Thomas Construction will begin demolition of existing building interiors immediately.  Compensation will be cost of work plus 12% fee.  As drawings are developed a detailed cost and lump sum will be developed.  

The contract included Attachment B-2, which was labeled Conceptual Budget and totaled $3.1 million for the construction bid.  
Goudelock made several hand written changes to the contract.  In section 3.1, Goudelock added the following provision to the language of Thomas contract:  Contract Sum shall be this amount, or it shall be lesser amount if cost of work including 12% fee is lesser amount at time of project completion.  See Article 6 below. 
In Article 6 he added the following language to Thomas contract:  See Article 3 above.  Contract Sum shall be $3,100,000.00 or cost of actual work including 12% fee, whichever is lesser amount.  Contractor understands that Lincoln-Harris Properties will act on behalf of Owner as a construction project manager to the extent authorized by Owner.  Goudelock did not remove any of the language regarding the alteration of the budget based on final drawings. 
Goudelock included the altered contract in a letter to Causey dated April 19, 2001.  The letter stated:  

Please find enclosed the original signed construction contract, along with copies of the plans that I have initialed for you [Causey], Clay [Elder], and Jeff [Thomas].  As you might expect from an attorney, I made a few alterations in a couple of places in the contract.  If there are any questions about these, please have [Thomas] let me know. 

Causey delivered the letter and altered contract to Thomas and instructed Thomas to call Goudelock if there were any problems.  Goudelock believed all parties were operating under the same belief that the project would be completed for a maximum price of $3.1 million.  
Thomas did not contact Goudelock regarding the changes in the contract.  Thomas discussed the changes with Causey and expressed concerns regarding the fairness of the changes.  Causey informed him that things would work out and that they could see where they stood once the final drawings were made and bids collected.  Causey testified he believed he called Goudelock and left a voicemail indicating Thomas would be calling regarding the changes to the contract.  He testified the call may not have been immediately upon learning of Thomas concerns but could have been the next day.   
Thomas continued to operate under the contract.  He stated he believed that if the final drawings reflected 3.1 million dollars worth of work, so be it.  If they reflected 4 million dollars worth of work, we were going to sit down and have a discussion about it and either work out the difference or in fact change the contract to suit the difference.  Goudelock continued with the project with the belief that Causey, Elder, and Thomas would work to produce a building that was in line with their March 20, 2001, discussion and would come in at or below a cost of $3.1 million.
On May 30, 2001, Rocketship closed on its bond financing.  The bond financing required significant upfront costs as well as payment of interest.   
Throughout the summer of 2001, the parties worked to complete final schematic drawings for the building including the materials and fixtures to be used.  During the process, Rocketship was kept informed of how the design was progressing by Causey.  Rocketship was under the belief that the estimated costs, based on the designs being developed, would be under the $3.1 million contract cost.   
The final drawings were completed in September 2001 by Elder.  The drawings, known as the red-edged drawings, were for a larger building than discussed in the March 20 meeting and included many high-end fixtures and materials.  The construction bids came in at $4.3 million originally, and were subsequently reduced to slightly less than $3.8 million based on the September drawings.  Causey presented the total of the bids to Rocketship on October 22, 2001.  The final price was unacceptable to
Rocketship. 
Lincoln Harris, Elder, and Thomas began the process of value engineering the project in order to reduce the cost to the $3.1 million requirement.  On October 26, 2001, Goudelock wrote a letter to Lincoln Harris Senior Vice President Ron Steen.  In the letter, he stated:  

I appreciate your efforts in trying to address the budgeting issues that have arisen regarding the construction of our building.  Pursuant to our discussion, you stated that approximately two weeks were needed to try and arrive at a potential resolution to this problem.  We agreed to proceed with this approach provided our firm does not incur any charges or expenses for the efforts taking place and, further, that the cost to us for this time delay are reimbursed. 

The first result was a cost of $3,677,890.00 to complete the larger 34,000 square foot building depicted in the red-edged drawings instead of the 29,500 square foot building discussed in March.  Thomas also proposed deducting one floor and other changes for a bid price of $3,098,500 or making those changes but adding other features for a price of $3,212,545.00.  Lincoln Harris also brought in Shelco, Inc. another contractor, to review the project.  While its bid was not firm and was subject to some variation, Shelco believed it could create a building similar to one it already completed in Greenville for $2.6 million in addition to the $431,000 already spent.  None of these alternatives were considered by
Rocketship.
Additionally, Thomas made a proposal to construct the building for approximately $3.2 million based on the size discussed at the March meeting.  However, when Thomas was unable to secure a performance bond, Rocketship refused to go forward. 
In November, Rocketship sent a letter to Lincoln Harris and Thomas demanding they build the project for the agreed upon price of $3.1 million.  When neither party responded, Rocketship terminated the agreement.  Rocketship signed an agreement to work with Elder and ESD to value engineer the building.  A new contractor, Mashburn Construction, was hired.  However, ESD was unable to create a project that met Rocketships demands.  Rocketship ordered Mashburn and ESD to stop all activities with the building.  Rocketship later sold the property to the City of Columbia for $1.4 million.  
Thomas filed a mechanics lien on the property of Rocketship.  Thomas sued to enforce the lien, and Rocketship filed a third-party complaint against Lincoln Harris and Causey.  Rocketships complaint against Lincoln Harris and Causey raised claims of, among others, breach of contract, negligent misrepresentation, breach of fiduciary duty, fraudulent misrepresentation, and unfair trade practices.  Thomas and Rocketship settled before trial.  The remaining parties agreed to a trial without a jury.  At trial Rocketship sought to recover all monies paid to the contractor, architect, and for financing costs.  The trial court dismissed the claims for fraudulent misrepresentation and unfair trade practices during the trial.  The parties submitted post-trial briefs on the remaining issues.  
The trial court found in favor of Lincoln Harris and Causey on all causes of action.  In addition, the trial court specifically held Lincoln Harris and Causeys actions were not the proximate cause of Rocketships alleged damages.  The court concluded:

Simply put, Rocketship never solved the basic development problems with the property:  (1) the land was too expensive for the size building MG&C needed; (2) the business plan relied on significantly over-market rental rates; (3) the Project was under financed; (4) parking issues were never resolved; and (5) the building site was unattractive.  

The court further held Rocketship never demonstrated the ability to complete the project, even at $3.1 million, because it lacked significant funding due to its decision to pay soft costs out of the bond financing.  Finally, the court found the termination of the project was based on Rocketships determination that the project was a bad pure investment when using realistic numbers for rental rates and income.  
Neither party filed a motion to alter or amend pursuant to Rule 59(e), SCRCP.  This appeal followed.
STANDARD OF REVIEW
This is an action at law.  See Sterling Dev. Co. v. Collins, 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992) (An action for breach of contract seeking money damages is an action at law.); Bivens v. Watkins, 313 S.C. 228, 230, 437 S.E.2d 132, 133 (Ct. App. 1993) (finding actions for negligent misrepresentation and breach of fiduciary duty are at law).  In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judges findings. Townes Assocs. v. City of Greenville, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976).  The judges findings are equivalent to a jurys findings in a law action.  Id.
LAW/ANALYSIS
The trial court ruled the actions of Lincoln Harris and Causey, even if they constituted a breach of contract, breach of fiduciary duty, or a negligent misrepresentation, were not the proximate cause of Rocketships damages.  Specifically, the court found Rocketships damages were caused by (1) the expense of the land relative to the building needs; (2) reliance upon over-market rental rates of almost $9 per square foot over market rates; (3) the project being under financed by almost $1.4 million (4) parking issues; (5) and the building site being unattractive.  Finally, the court found:  The conclusion of a bad pure investment led to the cancellation of the project and, therefore, the court found Lincoln Harris and Causey were not liable for any of the damages.  
Rocketship never specifically challenged the grounds discussed by the trial court for why the project was not completed.  Rocketship has also failed to explain in its brief how those grounds did not cause the termination of the project or how Lincoln Harris and Causeys actions were the sole proximate cause of the damages sought by Rocketship.  The only times the issue is marginally addressed is in conclusory comments regarding other issues.  For example, Rocketship stated:  Lincoln Harriss and Causeys actions were the sole proximate cause of Rocketships damages, being out of pocket approximately $1.4 million, with a partially completed building that could not be constructed for its $3.1 million budget.  We find Rocketship failed to meet its burden of proving the trial court erred in its conclusions regarding proximate cause.  See Weaver v. Recreation Dist., 328 S.C. 83, 88, 492 S.E.2d 79, 82 (1997) (stating the trial courts findings come to the appellate court with a presumption of correctness, and the burden is on the appellant to demonstrate reversible error).  
Furthermore, we find the trial courts findings and conclusions are supported by the evidence.  Ordinarily, the issue of proximate cause is a question of fact for finder of fact, in this case, the trial court.  See McNair v. Rainsford, 330 S.C. 332, 349, 499 S.E.2d 488, 497 (Ct. App. 1998).  
As the trial court noted, the Rocketship members knew on March 29, 2001, that the project was not a good investment.  In an email from that date, Goudelock noted that MG&C would have to pay Rocketship $25 per square foot in rent.  This figure is $9 per square foot over the market rate for Columbia.[1]  In response to this e-mail, one of the partners, Jay Courie, stated: Excuse me while I throw up.  My gut tells me to scrap this deal and find some 16$ space to lease.  I can save without being forced.  Similarly, another partner, Hugh McAngus, wrote: I wish we could sell it to someone.  
The parking issues were also an uncontested obstacle in the projects development. Rocketship entered into a parking lease agreement to provide 60 nighttime (6 p.m.-8 a.m.) parking spaces for 40 years.  This allowed for only 8 parking spaces to be available to Rocketships tenant between 6 p.m. and 8 a.m.  Rocketship attempted to entice the City of Columbia into contributing to the construction of a parking garage on Rocketships property.  In their proposal to the City, Rocketship acknowledged that the property had insufficient parking to support a 30,000 square foot building.  Rocketship admitted the parking lease adversely affects [Rocketships] ability to appropriately utilize its building in a commercially reasonable manner, and makes it unfeasible to go forward with the project unless additional parking can be procured.   
The city declined to participate in the project.  A member of the Citys Economic Development division noted that considering what Rocketship paid for the property and what it would cost to build the proposed office building and the current rental rates, it will be difficult for the firm to carry the cost of the project.  He also noted, Due to the high purchase price, $1.3 million[,] and the size of the property, [Rocketship] is unable to create a development scenario that will work.   
The record also supports the trial courts holding that the project was under financed.  Goudelock acknowledged that although the March 29 business plan identified a budget gap of $640,500, he had understated the amount and the true budget gap was closer to $1.4 million.  Rocketship offered no argument on appeal contesting the trial courts holding that Rocketship would have had to borrow funds to cover this $1.4 million gap and Rocketship never demonstrated that additional funding to complete the project was available.  
In its February 12, 2002 business plan, Rocketship used a more reasonable rental income figure of $21 per square foot.  It also acknowledged that the property would not appraise for what it had in it.  It concluded the project was a bad pure investment.  Rocketship stopped construction after making this conclusion.  
In addition, prior to Rocketships termination of the project, Thomas, Shelco, and Mashburn all presented possible solutions to Rocketship for completing the building very close to or at the required amount of $3.1 million.  All proposals were rejected by Rocketship without allowing the companies to more fully develop the proposals or to attempt to complete the building.  
We find the evidence supports the trial courts ruling that Rocketships realization that the project was a bad pure investment, rather than any action by Lincoln Harris, led to its decision to cancel the project.  Thus we affirm the trial courts ruling that Lincoln Harris cannot be held liable for Rocketships decision to cancel the project.  
AFFIRMED.[2]
HUFF, STILWELL, and BEATTY, JJ. concur.

[1]In their current lease, MG&C agreed to pay $16.00 a square foot for the first year incrementally increasing to $18.02 a square foot in year 7 of the lease.  
[2] As we affirm the trial courts ruling that Lincoln Harriss action were not the proximate cause of Rocketships claimed damages, we need not address Rocketships remaining issues.