2112

Rodney C. JERNIGAN, Jr., as Guardian Ad Litem for Perry Pressley, Appellant v. J. Stovall KING, M.D., and McLeod Regional Medical Center, Defendants, of whom Kenneth S. Kammer, M.D., is Respondent

(440 S.E. (2d) 379)

Court of Appeals

*Desa A. Ballard* and *L. Joel Chastain*, of *Ness, Motley, Loadholt, Richardson & Poole,* Barnwell; and *Thomas D. Rogers,* of *Ness, Motley, Loadholt, Richardson & Poole,* Charleston, *for appellant.*

*Ernest J. Nauful, Jr.* and *Andrew F. Lindemann,* both of *Nauful & Ellis,* Columbia, *for respondent.*

Heard Nov. 3, 1993.

Decided Dec. 28, 1993. Reh. Den. Mar. 3, 1994.

LITTLEJOHN, Acting Judge:

Rodney C. Jernigan, as Guardian Ad Litem for Perry Pressley, sued physicians J. Stovall King and Kenneth S. Kammer, as well as McLeod Regional Medical Center (MRMC), for medical malpractice for injuries Perry received while being treated by King and Kammer. Kammer moved for summary judgment on the basis that he owed no duty to Perry. The trial court granted the motion and Jernigan appeals. We affirm.

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56, SCRCP; *Baugus v. Wessinger*, 303 S.C. 412, 401 S.E. (2d) 169 (1991). All ambiguities, conclusions, and inferences arising in and from the evidence must be construed most strongly against the movant. *Id.* Viewed in this manner the record reveals the following facts.

King was the sole shareholder in Carolina Neurological Services, P.A. and had active staff privileges at MRMC. Kammer was King's employee.

On August 2, 1982, Perry complained of a severe headache and he was taken to his physician, Marion Fowler. Perry lost consciousness and was transported to the emergency room at MRMC. The attending physician, King, admitted Perry to MRMC at about 8:55 p.m. On August 3, 1982, at about 8:00 a.m., Kammer, while on call for King, responded to an emergency code from Perry's room and discovered Perry in arrest. Kammer resuscitated Perry, ordered Perry transferred to the intensive care unit, placed him on a respirator, ordered blood gas studies, ordered intravenous fluids to be administered, ordered checks on vital signs, and ordered an immediate CT scan. At about 8:25 or 8:30 a.m., King resumed responsibility for Perry's care.

Neither Kammer nor King reviewed the results of the CT scan. Those results indicated "intracranial hemorrhage, as well as intracranial pressure sufficient to cause brain compression as evidenced by a shift of intracranial contents to the right."

On August 6, 1982, Kammer saw Perry again while on call for King. Kammer ordered another CT scan and, upon receiv-

ing the results, performed immediate surgery to relieve the pressure. Jernigan claims the delay in treating Perry from August 3 through August 6 most probably resulted in permanent brain damage to Perry.

Jernigan brought this action on Perry's behalf against King, Kammer and MRMC. After some discovery Kammer moved for summary judgment. The trial court granted the motion and Jernigan appeals.

At oral arguments, Jernigan's counsel stated that Jernigan was not claiming that by beginning treatment on Perry on August 3, 1982, Kammer was liable for Perry's care throughout Perry's illness. Rather, Jernigan's position was that once Kammer began a particular course of treatment during the emergency period when he was covering for King, he had an obligation to exercise due care in completing that particular treatment. Counsel stated that Kammer had an obligation to evaluate the CT scan or "to make sure someone else does—he has a responsibility to make sure that it is followed up." Counsel also stated that Kammer "ordered a CT scan and did absolutely nothing to make sure that anybody even bothered to look at it." Finally, counsel stated "the fact that [Kammer] undertook emergency services and ordered a CT scan and put this ball into motion by definition create[d] a duty to make sure someone catches the ball on the other side."

We assume, without deciding, Jernigan is correct that once Kammer ordered a CT scan on August 3, he was under a duty to see to it that the scan was performed and to see the results, or to see to it that someone else evaluated the results. We hold the trial court correctly granted summary judgment for Kammer in this case.

Medical malpractice is the failure of a physician to exercise that degree of care and skill which is ordinarily employed by the profession generally, under similar conditions and in like surrounding circumstances. *Welch v. Whitaker*, 282 S.C. 251, 317 S.E. (2d) 758 (Ct. App. 1984). In a medical malpractice action the plaintiff must establish by expert testimony both the required standard of care and the defendant's failure to conform to the standard, unless the subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the defendant's conduct. *Pederson v. Gould*, 288 S.C. 141, 341

S.E. (2d) 633 (1986); *Botehlo v. Bycura,* 282 S.C. 578, 320 S.E. (2d) 59 (Ct. App. 1984). Thus, on a defendant's motion for summary judgment, there will usually be no genuine issue of material fact unless the plaintiff presents expert testimony on the standard of care and its breach by the defendant. *Botehlo v. Bycura.*

In his affidavit, Kammer stated:

> [P]rior to the CT scan being performed on Perry Pressley and after having [been] informed by [Kammer] **of what had transpired and what had been done,** J. Stovall King, M.D., resumed responsibility for the care of his patient, Perry Pressley, this being approximately 8:25 or 8:30 a.m. August 3, 1982.

(emphasis ours). In his brief, Jernigan stated:

> Kammer abandoned Perry's care when King appeared at the hospital at approximately 8:25 or 8:30 a.m. on August 3, 1982, after Kammer had stabilized Perry and Perry had been transported to the radiology department for the CT scan. . . . Having found Perry near death and having ordered vital signs and neurological checks every hour and an immediate CT scan, among other actions to stabilize Perry, Kammer then abruptly abandoned any further care for Perry, even a review of the CT scan that he had ordered "immediately." **He simply told King what had happened and walked away.**

Hence, according to the only evidence in the record as well as a description in Jernigan's brief of what happened, Kammer discharged the very duty Jernigan claims he breached.[1] That is, although Kammer did not read the results of the CT scan

---

[1] Jernigan refers to an affidavit by his expert, Dr. Benjamin Carson, as evidence that Kammer should have recognized that King's treatment of Perry was substandard, so that Kammer was negligent in abandoning Perry by returning him to the care of his primary physician, King. However, the trial court ruled that Carson's affidavit should not be considered because Jernigan did not serve it upon opposing parties until the date of the hearing and not outside the two-day time limit imposed by Rule 56(c), SCRCP, for serving opposing affidavits, despite the fact that Jernigan had the affidavit for nearly a month prior to the hearing. Jernigan did not appeal that ruling. Even if he had, we would affirm, since the affidavit must be served "not later than two days before the hearing." Rule 56(c). Hence, it was within the trial court's discretion to reject the untimely affidavit.

himself since the scan had not even been performed when King resumed responsibility for the case, Kammer told King "what had been done" and "what had happened." He was thus seeing to it that someone else (King, who was Perry's primary physician to begin with) was advised that a CT scan had been performed, so that King could read the results. In sum, the only evidence in the record is that Kammer did the very thing Jernigan claims Kammer was under an obligation to do, that is, see to it that the course of treatment he had begun would be completed. Under these circumstances, summary judgment for Kammer was appropriate.

Because of our disposition of this case we need not address Jernigan's remaining arguments. *See Whiteside v. Cherokee County School District No. One,* — S.C. —, 428 S.E. (2d) 886 (1993) (the Supreme Court declined to address issues raised on appeal in view of its affirmance based upon an independent dispositive issue on appeal); *Daniels v. City of Goose Creek,* — S.C. —, 431 S.E. (2d) 256 (Ct. App. 1993) (where reversal on an issue would not change the result, the issue is moot, and the Court of Appeals need not reach it).

Affirmed.

CURETON and GOOLSBY, JJ., concur.