608 S.E.2d 440

**Harry MONTGOMERY, Appellant,**

**v.**

**CSX TRANSPORTATION, INC., Respondent.**

**No. 3903.**

Court of Appeals of South Carolina.

Heard Oct. 13, 2004.

Decided Dec. 6, 2004.

Rehearing Denied Feb. 16, 2005.

532

Mark A. Stephens and Robert A. McKenzie, both of Columbia, for Appellant.

Mark C. Wilby, of Augusta, GA, for Respondent.

ANDERSON, J.:

Harry Montgomery, a railroad employee with CSX Transportation, Inc. (CSX), was injured as he attempted to tighten a bolt on a railroad track. Montgomery filed this action against CSX Transportation, Inc. under the Federal Employers' Liability Act. The circuit court granted summary judgment. We reverse and remand for trial.

## FACTUAL/PROCEDURAL BACKGROUND

CSX Transportation, Inc. (CSX) owns and operates two mainline tracks north of Charleston, South Carolina: the "A-line" and the "S-line." The A-line runs from Charleston to Dillon, South Carolina to Rocky Mount, North Carolina to Richmond, Virginia and beyond. The S-line runs from Charleston to Andrews, South Carolina then cuts inland to Hamlet, North Carolina, then to Raleigh, North Carolina and then cuts eastward and reconnects with the A-line north of Rocky Mount.

Other than the physical places that the rails run, there are several significant differences between the A-line and S-line. First, the A-line is made of "welded rail," which is continuous quarter-mile rail sections welded together. Thus, there are no track bolts or nuts on the A-line needed to hold the rail together. Contrastively, the S-line is made up of "jointed rail." "Jointed rail" is made from thirty-nine foot rail sections held together by "rail joints," which are iron plates placed on either side of the ends of the rail where they abut. The plates are attached to the rails by six large track bolts and nuts which hold the rail sections together.

Second, the A-line is much more active than the S-line in terms of the amount of traffic run by CSX on the rail. The A-line is a "Class 4 Track"—a high speed passenger track through which most of the freight is run. On the other hand, the S-line is a "Class 3 Track" that is mostly used for local freight. Between sixteen and seventeen trains run daily on the A-line. Approximately three trains run daily on the S-line.

Third, at the time of the events which form the basis of this suit, the A-line was in much better condition than the S-line. Harry Montgomery, the plaintiff in this action and a CSX employee since 1977, described the difference between the two tracks:

[The S-line] was tore up and run down for many years and you had to be there to see it. It was—it was a bad railroad track. It was a bad piece of track. It was rough, it was rugged, there was a lot of work. I mean a whole lot more work to have been done on that piece of railroad track than it was on the A Line.

Because of the S-line's poor condition, CSX placed a lot of "slow orders" on the S-line, which meant that the freight that needed to be run was often "backed-up." In fact, CSX's employees were told that the Federal Railroad Administration (FRA) was going to shut down the S-line because the track was in such bad shape. Fourth, the employees working on the A-line were given more equipment and much superior equipment than that given to Montgomery, the only track maintenance employee on the S-line.

Montgomery began working for CSX in 1977. In 1994, he was promoted to foreman. At the time of Montgomery's injury in 1999, James F. Reed was Montgomery's Roadmaster in charge of both the A-line and the S-line. Darrell Crook was CSX's Assistant Division Engineer. There were two track inspectors working for Reed: Montgomery and Ussery. A track inspector's job is to inspect the railroad tracks, look for anything that is unsafe, and try to make it safe or take it out of service. Montgomery summarized a track inspector's duties:

> [T]ighten[ed] track bolts, replaced broken joints, replaced broken joint bars, replaced anything that's—that might be broken or defective in a switch or on—on, not necessarily in a switch, but preferably in a—well, more important in a switch or on just railroad tracks to assure proper rock, railroad we call a balance, but it's railroad rocks, so that you would understand, make sure that on a given day if there is a lot of rocks, ample rocks, enough rocks on a given— anything to make sure that signs, railroad signs, that they're supposed to be in place are in place, report anything that we see that's out of the ordinary that would—that would allow a piece of track to be unsafe.

Although Montgomery had twenty years of experience and Ussery had only worked for CSX for two years, Reed and Crook took Montgomery off the A-line and gave supervision of that line to Ussery. Montgomery was made the inspector of the S-line. Ussery was then labeled the "Senior" Track Inspector. These changes occurred approximately one to two months before Montgomery's accident. Because Montgomery felt his job would be in danger if he complained, he did not refuse to work on the S-line.

Montgomery was responsible for the "Andrews Subdivision" of the S-line, a stretch of track forty-five to fifty miles long. Crook professed that at the time he assigned Montgomery to the Andrews Subdivision of the S-line, he knew that it "had a lot of bolts out, [it] had broken bars over there, [it] had a good many weak ties and had some surface conditions." In actuality, the condition of the track was much worse. Few of the bolts that held the jointed rails together were secure. Some were loose, while others were missing. In fact, some joint bars needed to be totally replaced and/or lifted up.

Although Montgomery was technically a "foreman" at the time of his injury, he had no employees working under his supervision on the S-line. Not only was Montgomery the only person assigned to inspect the S-line, but he was also the only person to make the repairs and maintenance on the S-line. Montgomery was required to inspect and repair and/or replace every bolt on every joint bar on the S-line. There are approximately 130 joints per mile per rail on the S-line, meaning that there were 3,120 bolts and nuts that needed to be checked per mile. Montgomery was required to be certain that more than 70,000 bolts were tightened and/or replaced in addition to all the other problems with the S-line.

Before Montgomery began work on this project, Crook advised Montgomery that he knew the S-line "was in bad shape." Because the S-line was in a state of disrepair, Crook promised Montgomery that CSX would provide him with a "bolt-tightening machine" to do the assignment. A "bolt-tightening machine" is a hydraulic, eight horsepower machine that mechanically tightens and loosens track nuts. Crook gave Montgomery a bolt-tightening machine, albeit a very old one. However, Montgomery was provided no other power equipment or welding equipment to repair the S-line. On the other hand, even though the A-line has no bolts to tighten (because it was welded rail) and was not in disrepair, Ussery was given a new truck with which to maintain the A-line. The truck was equipped with a newer bolt-tightening machine, a MAT-weld unit—a detachable hydraulic and gas-powered unit that allowed the user to operate power tools while working on the line, including, but not limited to, power wrenches, power saws, power drills, welding equipment, and a welding torch.

On Montgomery's first day of work on the S-line, the old bolt machine given to him by Crook failed and became inoperable. It was neither repaired nor replaced by CSX. The other bolt-tightening machine issued to Ussery, the only remaining machine that CSX allocated to Crook's department, which covered 1400 miles of track, was not made available to Montgomery even though Ussery had no real need for it. Because CSX would not give Montgomery another machine or even Ussery's machine, Montgomery's only alternative was to replace and tighten the bolts by hand with a three to four foot long manual "track wrench."

To use the track wrench, Montgomery had to stand on the ground facing the rail with the head of the wrench pointing down and fastened on the nut. The nut is on the opposite side of the rail from the bolt head. The head of the bolt is oblong and fits into an oblong hole on the inside of the joint bar so it will not move if the nut is tightened or loosened on the other side. Montgomery would then push the handle of the wrench from right to left to remove the nut or left to right to tighten the nut.

Every day for the entire day, Montgomery tightened and replaced bolts by hand with the manual track wrench. Montgomery stated that he "was supposed to go on as far as, you know, my work time would allow me to [every day]." Although Montgomery had been working over a month on the S-line's Andrews Subdivision at the time he was injured, he had only been able to repair a few of the forty-five miles of his assignment before he was hurt.

Montgomery was injured on July 13, 1999, between 11:30 a.m. and 12:00 p.m., approximately three-and-a-half hours after he began working that day. He was trying to tighten a loose nut with the track wrench when the nut stiffened up or froze on the bolt. When Montgomery applied more pressure, the frozen nut suddenly gave way, the end of the wrench came off the nut, he was thrown between the rails by his momentum, and he landed hard on the track on his right knee, side, and elbow. Montgomery explained:

Okay. When I—when I started to tighten this—this bolt, after I seen that that bolt—that particular bolt was loose, I got my wrench and I—I—I positioned myself and I, you

know, went about trying to tighten it. So I give it a few turns and at one point the—the wrench, the bolt actually froze, so I went about giving it some—and I—as I looked, the bolt was not—it was not tightening. So when I get to—when I went and put my wrench back on there and I tried to tighten it some more, the bolt had froze, which allowed me to apply just a little more pressure than normal, and then all of a sudden the whole thing gave which sent me—threw me across the rail, sent me across the rail.

Montgomery had neck surgery and knee surgery as a result of the accident.

At the time Montgomery was injured, which was the midpoint in his shift, he had already tightened or replaced over 200 bolts that day. He was not charged with violation of any rule by CSX. Yet, the attorney for CSX criticized Montgomery for trying to free up and tighten the tough bolt. Montgomery realistically had no option but to try to do so:

Q: Do you have any procedures or instructions for what to do in the event that a bolt sticks like that one did, any rules or regulations?

A: Well, you've got—you've got-you have several options, because if you—if—if given I had that—that—that torch that I was telling you about, you can cut it off and don't even have to use a wrench or if a welder was in the area, you can—you can ask him to cut it off, which is the same as cutting it off.

Q: And then just put a new one on there?

A: That's right.

Q: Okay. And why did you not just stop and get somebody to come and do that for y[ou]?

A: Oh, well, no, it's not like that, Miss. It's not that every time you run into a joint bar you call a welder to tighten it. That's—that's—that's part of your job. I mean, that's—and you don't cry—you don't cry or scream help every time you run into a minor problem.

According to Montgomery, even if he had called, no one would have come to cut one single bolt:

Q: She asked could you have called for help. Could you have gotten any help?

A: It is very doubtful that I would have gotten any. I could have called.

Ms. McLeod: Why is it doubtful?

The Witness: Because of the amount of people that works—that was working at the time in Bennett Yard, a shortage.

Montgomery filed a personal injury action against CSX under the Federal Employers' Liability Act (FELA), asserting his injuries were caused "in whole or in part" by the negligence of CSX. Montgomery alleged that he was assigned an unreasonable task, maintenance of the entire S-line, and the recurring tightening of bolts required by this assignment caused his injury. Alternatively, or in combination with the unreasonable task theory, Montgomery averred he was provided insufficient equipment for the task assigned. In his complaint, Montgomery specifically claimed that CSX was negligent "in its engines, cars, appliances, machinery, roadbed, track, work assignments and methods, works or other equipment" and in its failure "to exercise reasonable care to furnish and maintain reasonably safe and suitable equipment and work methods and [to provide] a reasonably safe place in which to perform his work."

CSX maintained that it follows job analysis and physical qualifications in assigning certain jobs. Indeed, Reed stated that a track worker like Montgomery would only normally be required to tighten two dozen bolts in a normal day of work and that if a worker has to tighten as many as 100 bolts in a day that he should be given a bolt tightening machine to properly perform his assignment:

Q: If he had—if—if you knew that a man would have to tighten as many as a hundred bolts in a day, would you give him a machine to do it?

A: Yes, if we had somebody doing that.

Reed inconsistently claimed that it is appropriate to require an employee to tighten 100 to 150 bolts a day with a track wrench. He did not express any opinion about whether 200 bolts was appropriate. Yet, Montgomery had already done 200 in less than half of the day's work.

In support of the theories asserted by Montgomery, he presented affidavits from two experts that show the assign-

ment given to Montgomery and the tools provided to Montgomery were not reasonably safe. First, Montgomery produced an affidavit from Don H. Bowden, Sr., a railroad safety consultant. Bowden has testified concerning common and reasonable work assignments and safety practices in the railroad industry. He explicated that repairing the Andrews Subdivision should not have been done by one worker alone:

Under common industry practice, this job should not be done by one man alone. Mr. Montgomery was assigned to the monumental task of repairing the track by himself. While it is not uncommon for one man to be assigned a task in inspecting a track, it is unreasonably hazardous to require one man to not only inspect the track, but also perform the actual track maintenance himself. A prudent and reasonable railroad would assign a gang of men to do this type of job. To do otherwise, in my opinion, subjects the employee to an unsafe workplace in the railroad industry because an accident is bound to happen.

Bowden declared the track wrench was an unsafe and unsuitable tool for this assignment:

The unreasonable hazards to which Mr. Montgomery was exposed by working this track by himself were greatly exacerbated and increased by CSX requiring him to replace and/or tighten the track bolts with a manual track wrench. While it is not uncommon for workers to use manual track wrenches to tighten sporadic loose bolts on a stretch of track, this particular track was in such a state of disrepair that the use of a track wrench was not only impracticable, it unreasonably increased the likelihood of injury to Mr. Montgomery. To use an analogy, a swing-blade works fine to knock-down sporadic weeds on a private lawn; however, one would not require a man to use a swing-blade to clear several years of growth on a 100 acre plat of land. In addition to the sheer volume of bolts that Mr. Montgomery needed to replace and/or tighten, the condition of the bolts and the track also made the manual track wrench an unsuitable tool for this job. This track had been neglected by CSX for a long period of time. As such, CSX should have known that the bolts were very likely to be "rusted-on," making them very difficult to remove and/or tighten. Requiring Mr. Montgomery to work with a manual wrench in

these conditions unreasonably multiplied his risk of injury. Mr. Montgomery's description of the accident shows these hazards were present because he was required to use a tremendous amount of leverage on the wrench to break through the rust. For all of these reasons, a prudent and reasonable railroad would not have supplied just a track wrench to Mr. Montgomery to do this job. A prudent and reasonable railroad would have provided him with another bolt tightening machine when the first one became inoperable or would have fixed the one assigned to him.

Second, Montgomery submitted the affidavit of Dr. Tyler A. Kress, Ph.D., a biomechanical engineer. In his affidavit, Dr. Kress discussed a 1986 study undertaken by the Association of American Railroads, which indicated that 11.1% of all tool-related injuries resulted from the use of track wrenches. Dr. Kress opined the type of work that Montgomery was performing daily and the tools he was given to perform that work created unreasonably dangerous biomechanical risks to his body:

It is my opinion that (1) the type of work that Mr. Montgomery was performing daily and (2) the tools he was given to perform that work created unreasonably dangerous biomechanical risk factors to his body. It is my further opinion that these risk factors are consistent with his fall and the injuries he sustained as a result of his fall.

Apparently, Mr. Montgomery was ordered to perform the repetitive motion of tightening and untightening bolts with a manual track wrench. Proper use of the track wrench requires the employee to keep the head of the wrench fixed on the nut that is being tightened or untightened. Keeping the head of the wrench on the nut is even more important when the bolts and nuts are rusted and susceptible to being "stuck." Sporadic use of the track wrench to tighten and untighten nuts and bolts would not normally cause risk to the human body. However, performing repetitive tasks daily—and specifically ones that require push/pull forces of the upper extremity and upper body like the track wrench— are widely associated with increased risk of injury because of the cumulative effects of the repetition and fatigue. In Mr. Montgomery's work environment, his use of the track wrench was not spora[d]ic because of the sheer number of

bolts that were evidentially in disrepair on this stretch of track. His fatigue from this manual, repetitive motion was increased by the increased forces needed to free the nuts and bolts from their rusted condition. With each repetitive use of the wrench, it became more physically difficult for Mr. Montgomery to control the wrench and its pivot point where the head is fastened to the nut. The probabilities of both (1) the wrench slipping off of the nut and (2) an abrupt motion occurring because of a nut breaking free are increased significantly due to the repetitive and tiring nature of the assigned job. It is understandable that Mr. Montgomery may fall if and when one of these events occur. Therefore, it is my opinion that his fall is a natural result of the work environment imposed on him by C.S.X.

CSX moved for summary judgment, which the circuit court granted.

## *ISSUES*

I. Under FELA and South Carolina summary judgment procedure, did the trial court err in granting the railroad employer summary judgment on a railroad employee's claim for negligent failure to provide a safe workplace?

II. Under FELA and South Carolina summary judgment procedure, did the trial court err in granting a railroad employer summary judgment on a railroad employee's claim for negligent failure to provide safe and suitable equipment?

III. Under FELA and South Carolina summary judgment procedure, did the trial court err in granting a railroad employer summary judgment on a railroad employee's FELA combined negligence claims?

## *STANDARD OF REVIEW*

When reviewing the grant of a summary judgment motion, the appellate court applies the same standard which governs the trial court under Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Laurens Emergency Med. Specialists v. M.S. Bailey & Sons Bankers,* 355 S.C. 104, 584 S.E.2d 375 (2003); *Regions Bank v. Schmauch,* 354 S.C. 648, 582 S.E.2d 432 (Ct.App.

2003). In determining whether any triable issue of fact exists, the evidence and all inferences which can reasonably be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Sauner v. Public Serv. Auth.*, 354 S.C. 397, 581 S.E.2d 161 (2003); *McNair v. Rainsford*, 330 S.C. 332, 499 S.E.2d 488 (Ct.App.1998). If triable issues exist, those issues must go to the jury. *Baril v. Aiken Reg'l Med. Ctrs.*, 352 S.C. 271, 573 S.E.2d 830 (Ct.App.2002); *Young v. South Carolina Dep't of Corrections*, 333 S.C. 714, 511 S.E.2d 413 (Ct.App. 1999).

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Moriarty v. Garden Sanctuary Church of God*, 341 S.C. 320, 534 S.E.2d 672 (2000); *Schmidt v. Courtney*, 357 S.C. 310, 592 S.E.2d 326 (Ct.App.2003). Even when there is no dispute as to evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Schmidt*, 357 S.C. at 319, 592 S.E.2d at 331. Summary judgment is a drastic remedy which should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues. *Cunningham v. Helping Hands, Inc.*, 352 S.C. 485, 575 S.E.2d 549 (2003); *Redwend Ltd. P'ship v. Edwards*, 354 S.C. 459, 581 S.E.2d 496 (Ct.App.2003).

## *LAW/ANALYSIS*

### I. Expert Witnesses/Affidavits

Rule 56(e), SCRCP, requires a party opposing summary judgment to come forward with affidavits or other supporting documents demonstrating the existence of a genuine issue for trial. *Doe v. Batson*, 345 S.C. 316, 548 S.E.2d 854 (2001). Where a motion for summary judgment is made and supported by proper affidavits, a plaintiff cannot rest on allegations in his pleadings that are controverted by affidavits and/or depositions submitted by defendants. *See* Rule 56(e), SCRCP; *Manley v. Manley*, 291 S.C. 325, 353 S.E.2d 312 (Ct.App.1987).

■ Use and admissibility of affidavit and deposition testimony to rebut a motion for summary judgment is governed by Rule 56(e) and reads in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Rule 56(e), SCRCP. Our appellate courts have interpreted Rule 56(e) to mean materials used to support or refute a motion for summary judgment must be those which would be admissible in evidence. *Hall v. Fedor,* 349 S.C. 169, 561 S.E.2d 654 (Ct.App.2002). "[O]n a defendant's motion for summary judgment, there will usually be no genuine issue of material fact unless the plaintiff presents expert testimony on the standard of care and its breach by the defendant." *Jernigan v. King,* 312 S.C. 331, 334, 440 S.E.2d 379, 381 (Ct.App.1993) (citing *Botehlo v. Bycura,* 282 S.C. 578, 320 S.E.2d 59 (Ct.App. 1984)).

## II. FELA

Section 1 of FELA renders common carrier railroads "liable in damages to any person suffering injury while ... employed by [the] carrier" if the "injury or death result[ed] in whole or in part from the negligence of any of the officers, agents, or employees of [the railroad]." 45 U.S.C. § 51 (1986). When Congress enacted FELA in 1908, its focus was on reducing injuries and death to employees resulting from accidents on interstate railroads. *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that "shifted part of the human overhead of doing business from employees to their employers." *Id.* at 542, 114 S.Ct. 2396 (internal quotations omitted).

FELA is a broad remedial statute which the United States Supreme Court construes liberally in order to effectuate its purposes. *See Id.* at 543, 114 S.Ct. 2396. The Supreme Court has interpreted FELA's language liberally in light of its humanitarian purposes. *Metro–North Commuter R.R. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997).

State courts have concurrent jurisdiction to hear FELA claims. 45 U.S.C. § 56 (1986). A FELA action brought in state court is controlled by federal substantive law and state procedural law. *Norton v. Norfolk S. Ry. Co.*, 350 S.C. 473, 567 S.E.2d 851 (2002). However, a form of practice may not defeat a federal right. *Brown v. Western Ry.*, 338 U.S. 294, 70 S.Ct. 105, 94 L.Ed. 100 (1949); *Norton*, 350 S.C. at 476, 567 S.E.2d at 853. A FELA action is controlled by state procedural law as long as the state procedural law does not conflict with federal substantive right guaranteed by FELA. *Norton*, 350 S.C. at 476, 567 S.E.2d at 853. It is firmly established that questions of sufficiency of evidence for the jury in cases arising under FELA in state courts are to be determined by federal rules. *Brady v. Southern Ry. Co.*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Norton*, 350 S.C. at 476, 567 S.E.2d at 853. The sufficiency of evidence needed to withstand a motion for summary judgment in a FELA case is controlled by federal, not state law. *Norton*, 350 S.C. at 476, 567 S.E.2d at 853.

The United States Supreme Court noted that liability under FELA rests upon "negligence" and that FELA does not make the railroad the insurer for all employee injuries. *See Metro–North Commuter R.R.*, 521 U.S. at 429, 117 S.Ct. 2113; *Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396. Although railroad workers are required to prove negligence under the federal FELA standard, the Supreme Court has held that employees need only show that their employer's negligence "played any part, **even the slightest,** in producing the injury." *Gottshall*, 512 U.S. at 543, 114 S.Ct. 2396 (emphasis added & internal quotations omitted). A plaintiff's burden in a FELA action is significantly lighter than it would be in an ordinary South Carolina common law negligence case:

[FELA's] [history] has been said to reduce the extent of the negligence required, as well as the quantum of proof necessary to establish it, to the "vanishing point." While it is still undoubtedly true that there must be some shreds of proof both of negligence and of causation, and that "speculation, conjecture and possibilities" will not be enough, there appears to be little doubt that under [FELA] jury verdicts for the plaintiff can be sustained upon evidence which would not be sufficient in the ordinary negligence action.

*Norton v. Norfolk S. Ry. Co.*, 341 S.C. 165, 533 S.E.2d 608 (Ct.App.2000), *rev'd on other grounds*, 350 S.C. 473, 567 S.E.2d 851 (2002) (citing W. Page Keeton et al., *Prosser & Keeton on Torts* § 80, at 578 (5th ed. 1984)) (internal quotations omitted).

In *Blair v. Baltimore & Ohio R.R.*, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945), the United States Supreme Court articulated:

> We think there was sufficient evidence to submit to the jury the question of negligence posed by the complaint. The duty of the employer "becomes 'more imperative' as the risk increases." *Bailey v. Central Vermont Ry.*, 319 U.S. · 350, 352, 353, 63 S.Ct. 1062, 1063, 1064, 87 L.Ed. 1444 [(1943)]. *See also Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L.Ed. 610 [(1943)]. The negligence of the employer may be determined by viewing its conduct **as a whole.** *Union Pacific Railroad Co. v. Hadley*, 246 U.S. 330, 332, 333, 38 S.Ct. 318, 319, 62 L.Ed. 751 [(1918)]. And especially is this true in a case such as this, where the several elements from which negligence might be inferred are so **closely interwoven** as to form a **single pattern,** and where each imparts character to the others.

*Id.* at 604, 65 S.Ct. 545 (emphasis added).

Thereafter, in *Lavender v. Kurn*, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), the Supreme Court explained:

> It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being

immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.

*Id.* at 653, 66 S.Ct. 740.

*Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), is particularly instructive:

Under th[e FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that e[m]ployer negligence played any part, **even the slightest,** in producing the injury or death for which damages are sought. **It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes** . . . . Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that **negligence of the employer played any part at all in the injury or death.** Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due "in whole or *in part*" to its negligence. (Emphasis added.)

The law was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes **the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.**

The kind of misconception evidenced in the opinion below, which fails to take into account the special features of this statutory negligence action that make it significantly differ-

ent from the ordinary common-law negligence action, has required this Court to review a number of cases. In a relatively large percentage of the cases reviewed, the Court has found that lower courts have not given proper scope to this integral part of the congressional scheme. We reach the same conclusion in this case. **The decisions of this Court after the 1939 amendments teach that the Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury.** Special and important reasons for the grant of certiorari in these cases are certainly present when lower federal and state courts persistently deprive litigants of their right to a jury determination.

*Id.* at 506–11, 77 S.Ct. 443 (footnotes omitted) (emphasis added).

### A. Unreasonable Task of Repairing the S–Line Track

As a corollary to the railroad employer's duty to maintain safe working conditions, it is required to provide its employee with sufficient help in the performance of the work assigned to him. *Blair v. Baltimore & Ohio R.R.*, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945). Where the failure to provide sufficient help causes, in whole or in part, injury to the employee, the railroad employer is liable for negligence under FELA. *Yawn v. Southern Ry. Co.*, 591 F.2d 312 (5th Cir.1979); *Southern Ry. Co. v. Welch*, 247 F.2d 340 (6th Cir.1957); *Deere v. Southern Pac. Co.*, 123 F.2d 438 (9th Cir.1941); *Cheffey v. Pennsylvania R.R.*, 79 F.Supp. 252 (E.D.Pa.1948); *Louisville & Nashvile R.R. v. Crim*, 273 Ala. 114, 136 So.2d 190 (1961); *see also Deere*, 123 F.2d at 441 ("when failure to provide sufficient help results in injury to an employee, there exists a ground of negligence which is recognized under [FELA]"); *Beeber v. Norfolk S. Corp.*, 754 F.Supp. 1364 (N.D.Ind.1990) (noting that, under FELA, railroad employer has duty to provide sufficient number of employees to perform assigned work and failure to provide adequate assistance can be breach of duty); *Leonidas v. Great N. Ry. Co.*, 105 Mont. 302, 72 P.2d 1007, 1013 (1937), *aff'd in part and cert. dismissed in part*, 305 U.S. 1, 59 S.Ct. 51, 83 L.Ed. 3 (1938) ("It is fundamental

that if the employer fails to use reasonable care to provide a sufficient number of workmen to conduct the work at hand with reasonable safety, he is guilty of negligence."); *Lis v. Pennsylvania R.R.*, 12 Misc.2d 868, 173 N.Y.S.2d 132, 134 (City Ct.1958) ("That failure or refusal upon the part of a defendant to provide a sufficient number of workmen to assist one of its employees, if such additional help is necessarily required by the kind of work to be done, constitutes negligence under FELA is now so well settled as not to require extended discussion.").

■ Here, Montgomery has presented sufficient evidence that a genuine issue of material fact exists as to whether the failure of CSX to provide him with sufficient help to repair the S-line caused, at least in part, his injuries.

### B. Duty to Provide Proper Equipment

■ As a FELA employer, CSX is "under a duty to exercise ordinary care to supply [tools,] machinery and appliances [that are] reasonably safe and suitable for the use of the employee." *Chicago & Northwestern Ry. Co. v. Bower*, 241 U.S. 470, 473, 36 S.Ct. 624, 60 L.Ed. 1107 (1916); *see also Chicago, Rock Island & Pac. R.R. v. Lint*, 217 F.2d 279 (8th Cir.1954); *Coal & Coke Ry. Co. v. Deal*, 231 F. 604 (4th Cir.1916); *Pitt v. Pennsylvania R.R.*, 66 F.Supp. 443 (E.D.Pa. 1946), *aff'd*, 161 F.2d 733 (3rd Cir.1947). Although a railroad "is not required to furnish the latest, best, and safest appliances, or to discard standard appliances upon the discovery of later improvements," it must still provide tools that are reasonably safe and suitable for the specific job. *Bower*, 241 U.S. at 474, 36 S.Ct. 624.

Because there is sufficient evidence that CSX knew or should have known that the manual track wrench was an unsafe and unsuitable tool for Montgomery to use to repair forty-five miles of the S–Line track by himself and Montgomery's experts attested factually that the manual track wrench was an unsafe and unsuitable tool for the circumstances of Montgomery's assignment, summary judgment should have been denied. Factually and legally, the jury could reasonably determine that CSX breached this duty to Montgomery.

## C. Totality of Negligence

 The United States Supreme Court, in *Blair v. Baltimore & Ohio R.R.*, 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945), clarified that, while several factors operating alone might not constitute negligence, where an insufficient amount of workers **and** insufficient tools **combine together** to create an unreasonably unsafe place to work, a breach of duty is established:

> We think there was sufficient evidence to submit to the jury the question of negligence posed by the complaint. The duty of the employer "becomes 'more imperative' as the risk increases." The negligence of the employer may be determined by viewing its conduct **as a whole.** And especially is this true in a case such as this, where the several elements from which negligence might be inferred are so **closely interwoven** as to form a **single pattern,** and where each imparts character to the others.

*Id.* at 604, 65 S.Ct. 545 (emphasis added and citations omitted). The *Blair* Court held that the fact that the plaintiff was commanded to undertake the movement of a greased, 1000 pound steel tube, thirty feet in length, with only a five foot truck and with only a few men "raised questions appropriate for a jury to appraise in considering whether or not the injury was the result of negligence as alleged in the complaint." *Id.* at 604–05, 65 S.Ct. 545 (citations omitted). The Court ruled: "We cannot say as a matter of law that the railroad complied with its duties in a reasonably careful manner under the circumstances here" and that "**the jury,** and not the court, should finally determine these issues." *Id.* (emphasis added).

The *Blair* case is controlling here. To make Montgomery not only work on the entire Andrews Subdivision of the S-line by himself all day, every day, until completed, but also limiting his ability to make the numerous repairs by only providing him with a manual track wrench is *prima facie* evidence of negligence, if not negligence as a matter of law. Because there is sufficient evidence for a reasonable jury to conclude that CSX failed to provide Montgomery with a safe workplace, the trial court improperly invaded the province of the jury to determine whether or not CSX was negligent.

## CONCLUSION

The trial judge concluded that the expert affidavits did not create a genuine issue of material fact. In contrariety to the circuit judge's finding, we come to the ineluctable conclusion that the expert witness affidavits were not only admissible but created genuine issues of material fact as to **NEGLIGENCE** under FELA. The circuit judge mistakenly and improvidently rejected the experts' opinions in the case *sub judice*.

Because a jury may reasonably draw inferences under the evidence that CSX was negligent, the trial court's grant of summary judgment was erroneous. It was improper for the trial court to weigh the quality or quantity of the evidence or to determine as a matter of law the inferences that may be drawn. "To deprive [railroad] workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." *Bailey v. Central Vermont Ry., Inc.*, 319 U.S. 350, 354, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943).

Accordingly, we **REVERSE** the circuit court's order granting summary judgment and **REMAND** this case for a jury trial.

**REVERSED and REMANDED.**

WILLIAMS, J., concurs.

GOOLSBY, J., dissents in a separate opinion.

GOOLSBY, J. (dissenting):

I respectfully dissent. I would affirm the trial court's determination that Montgomery failed to present sufficient evidence to survive summary judgment on any of his three theories of CSX's alleged negligence under FELA.

A FELA action in state court is controlled by federal substantive law.[1] I agree that, under the federal FELA standard, a plaintiff in a FELA case need only show that the "employer's negligence played any part, even the slightest, in producing the injury."[2] Nevertheless, although the quantum

---

1. *Norton v. Norfolk S. Ry.*, 350 S.C. 473, 476, 567 S.E.2d 851, 853 (2002).

2. *Rogers v. Mo. Pac. R.R.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

of evidence sufficient to present a jury question of causation in a FELA case is less than that required in a common law tort case, the plaintiff must still demonstrate some causal connection between the defendant's negligence and the alleged injury.[3] As the South Carolina Supreme Court has recognized, " 'the FELA ... is not to be interpreted as a workers' compensation statute.' "[4]

In support of his argument that sufficient evidence was presented of CSX's failure to provide sufficient help with the repair of the S-line, Montgomery points to the affidavit of Don A. Bowden, a railroad safety consultant, who stated as follows:

5. Under common industry practice, this job should not be done by one man alone. Mr. Montgomery was assigned to the monumental task of repairing the track by himself. While it is not uncommon for one man to be assigned a task in inspecting a track, it is unreasonably hazardous to require one man to not only inspect the track, but also perform the actual track maintenance himself. A prudent and reasonable railroad would assign a gang of men to do this type of job. To do otherwise, in my opinion, subjects the employee to an unsafe workplace in the railroad industry because an accident is bound to happen.

I agree with the trial court that, because the dispute here did not involve a task that required more than one worker, such as dragging a heavy object, assigning additional employees would mean only that the job would be finished more quickly.[5] Indeed, it was acknowledged by Montgomery him-

---

3. *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 503 (9th Cir.1994).

4. *Norton*, 350 S.C. at 480 n. 5, 567 S.E.2d at 855 n. 5 (quoting *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 436–37 (4th Cir.1999)).

5. *See Frazier v. Norfolk & W. Ry. Co.*, 996 F.2d 922, 923 (7th Cir.1993) (concerning a plaintiff who was injured while unloading 11,600–pound double-axle wheel assemblies from a trailer); *S. Ry. Co. v. Welch*, 247 F.2d 340, 341 (6th Cir.1957) (noting "circumstances of particular difficulty" warranting assigning additional personnel to assist in a particular task); *McKennon v. CSX Transp.*, 897 F.Supp. 1024, 1027 (M.D.Tenn.1995) (holding in a summary judgment case that "the fact that Plaintiff's job would have been easier if there had been more workers does not constitute negligence on the part of Defendant, nor does it create an unreasonably unsafe work environment").

self that CSX imposed no time limits or quotas for the work Montgomery was performing at the time of his injury.[6] Moreover, Bowden did not explain why the task assigned to Montgomery was unreasonably dangerous without additional help or how Montgomery's accident was "bound to happen" as a result of this circumstance.[7]

In addition, Montgomery cites *Forcino v. National Railroad Passenger Corp.*[8] in support of his argument that an unreasonable work assignment from CSX proximately caused his injuries. I agree with CSX that this reliance is misplaced.

In *Forcino*, the plaintiff, while repairing a track that had been damaged by a derailment, allegedly injured himself as a result of the strain and fatigue of the heavy work. Unlike Montgomery, however, Forcino was performing a task outside his regularly assigned duties when he was injured, had been told to rush to finish the job to which he had been reassigned, and had worked without taking his normal afternoon break. In contrast, at the time of his injury, Montgomery was doing the same tasks that he had been performing for at least the previous month, had never claimed to be affected by fatigue, and by his own admission was instructed to go only as far as he was able to work at his own speed.

Montgomery further challenges the trial court's determination that "[t]he lack of any time requirement precludes a claim

---

6. Montgomery testified in his deposition as follows: "I was supposed to go on as far as, you know, my work time would allow me to and you know, get off."

7. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Lavender v. Kurn*, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946) (stating speculation and conjecture are not a substitute for probative facts); *Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F.Supp. 1566, 1574 (N.D.Ill.1996) ("An affidavit that does not set forth the facts and reasoning used in making a conclusion amounts to nothing more than a denial of the adverse party's pleading."); *E.T. Barwick Indus. v. Walter Heller & Co.*, 692 F.Supp. 1331, 1347 (N.D.Ga. 1987) ("Theoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert ... are [not] entitled to any weight when raised in opposition to a motion for summary judgment.") (citations omitted), *aff'd*, 891 F.2d 906 (11th Cir.1989).

8. 671 So.2d 888 (Fla.Dist.Ct.App.1996).

that defendant exposed plaintiff in a 'fatigued and exhausted condition to unreasonable peril' so that defendant could be found negligent in doing so." Assuming without deciding that Montgomery is correct that the trial court should not have made this finding, this error is of no consequence. Montgomery never specifically argued on appeal that he was suffering from fatigue or exhaustion on the day he was injured.

Montgomery further contends that the practical considerations of the burdens imposed by CSX could yield the inference that he felt pressure to maintain more bolts than could be reasonably expected of an employee in his situation. This argument lacks merit.

Montgomery first points out that, had he tightened only as many bolts as his supervisor agreed was reasonable during a normal workday, he would have taken almost eight years to complete his assignment.[9] He further argues that testimony from his supervisor that CSX would lose profits when a rail is in disrepair gives rise to an inference that CSX would look unfavorably on his performance unless he worked at a faster than normal pace. There was no evidence, however, that Montgomery himself was aware of any financial concerns of CSX.

Similarly, Montgomery cites the threat of a shutdown of the S-line by the Federal Railroad Administration as additional evidence of an internal time pressure imposed by CSX. He testified in his deposition that there had been "some talks ... that ... [the] 'S' line was in bad shape, that something had to be done or they were talking about shutting the railroads down." I agree with CSX, however, that this evidence was hearsay and therefore properly rejected by the trial court.[10]

---

**9.** Montgomery notes in his brief that one of the supervisors testified that a track worker with only manual equipment would be expected to tighten only 24 bolts during a normal workday.

**10.** *See Hall v. Fedor,* 349 S.C. 169, 175, 561 S.E.2d 654, 657 (Ct.App. 2002) (holding hearsay evidence presented in response to summary judgment motion did not create a genuine issue of material fact because "[o]ur appellate courts have interpreted Rule 56(e) to mean materials used to support or refute a motion for summary judgment must be admissible in evidence").

Similarly, I find no merit to Montgomery's argument that he had presented sufficient evidence to support a finding that CSX was negligent in providing him with only a manual track tool.

Under FELA, employers are under a duty to exercise ordinary care to supply machinery and appliances reasonably safe and suitable for the use of their employees; however, employers are not required to furnish the latest, best, and safest appliances, or discard standard appliances upon the discovery of later improvements, provided those in use are reasonably safe and suitable.[11] It is undisputed that the track wrench Montgomery was using when he fell was not defective and was similar to other track wrenches he had used for the past twenty years.

The focus of this controversy comes down to whether CSX should have provided a bolt-tightening machine in view of expert testimony suggesting that a manual track wrench, although not defective, was unreasonably dangerous for Montgomery's assignment.[12]

Bowden provided a statement acknowledging that, although a manual track tool was safe and suitable for sporadic tightening and untightening of bolts, the Andrews subdivision "was in such a state of disrepair that the use of a track wrench was not only impracticable, it unreasonably increased the likelihood of injury to Mr. Montgomery." Bowden further noted that, as the S-line "had been neglected by CSX for a long period of time," "CSX should have known that the bolts were very likely to be 'rusted on,' making them very difficult to remove and/or tighten." Similarly, Tyler A. Kress, an industrial engineer, stated in an affidavit that "when an employee is forced to use a manual track wrench all day long on rusted and poorly tended nuts and bolts, the risk of injury increases with each repetitive use."

---

**11.** *Chicago & N.W. Ry. v. Bower*, 241 U.S. 470, 473–74, 36 S.Ct. 624, 60 L.Ed. 1107 (1916).

**12.** *See McKennon*, 897 F.Supp. at 1027 ("Under FELA, the proper inquiry is whether the method prescribed by the employer was reasonably safe, not whether the employer could have employed a safer alternative method for performing the task.").

I would hold the trial court correctly concluded that the expert opinions offered in response to CSX's summary judgment motion do not give rise to an inference that a manual track wrench was not reasonably safe for the work that was assigned to Montgomery. There was no admissible evidence supporting a finding that Montgomery was subject to any pressure with respect to the amount of work he had to complete in any given time period. Furthermore, the record is devoid of any suggestion that Montgomery was suffering from fatigue or other ill effects of repetitive motion.[13]

Finally, citing *Blair v. Baltimore & Ohio Railroad Co.*,[14] Montgomery argues he presented sufficient evidence of negligence on the part of CSX through the combined effect of its failure to provide him with the necessary help and its refusal to give him proper equipment. I disagree.

In *Blair*, the Supreme Court, in reinstating an award under FELA, held there was sufficient evidence of the railroad defendant's negligence to have the issue determined by a jury. In so holding, the Supreme Court stated as follows:

> The negligence of the employer may be determined by viewing its conduct as a whole. And especially is this true in a case such as this, where the several elements from which negligence might be inferred are so closely interwoven as to form a single pattern, and where each imparts character to the others.[15]

---

**13.** *See Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir.1990) (stating that although "relaxed standards applied in FELA and Jones Act suits" do not require a medical expert "to articulate to a 'reasonable degree of medical certainty,' . . . a medical expert must be able to articulate that it is likely that the defendant's negligence, or more than possible that the defendant's negligence, had a causal relationship with the injury and disability for which the plaintiff seeks damages"); *Moody v. Me. Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir.1987) ("[A]lthough a plaintiff need not make a showing that the employer's negligence was the *sole* cause, there must be a sufficient showing (i.e., more than a possibility) that *a* causal relation existed."); *Collier v. Varco–Pruden Bldgs.*, 911 F.Supp. 189, 192 (D.S.C.1995) (finding an expert's affidavit "amount[ed] to nothing more than his speculation as to what 'most likely' happened, and has no support in the record").

**14.** 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490 (1945).

**15.** *Id.* at 604, 65 S.Ct. 545 (citations omitted).

Further reading of the opinion, however, indicates that the cumulative impact of the "several elements from which negligence might be inferred" was not the deciding factor in the decision. Rather, it is evident from the text immediately following what is quoted above that the Supreme Court had already accepted the premise that the railroad employer was negligent in several respects, any one of which would have been actionable in its own right, and the relationship between all of these undisputed manifestations of negligence only enhanced an already meritorious action:

> The nature of the duty which the petitioner was commanded to undertake, the dangers of moving a greased, 1000 pound steel tube, 30 feet in length, on a 5 foot truck, the area over which that truck was compelled to be moved, the suitableness of the tools used in an extraordinary manner to accomplish a novel purpose, the number of men assigned to assist him, their experience in such work and their ability to perform the duties and the manner in which they performed those duties—*all of these raised questions appropriate for a jury to appraise in considering whether or not the injury was the result of negligence as alleged in the complaint.* We cannot say as a matter of law that the railroad complied with its duties in a reasonably careful manner under the circumstances here, nor that the conduct which the jury might have found to be negligent did not contribute to petitioner's injury "in whole or in part." Consequently, we think the jury, and not the court should finally determine these issues.[16]

In contrast, none of the specifications of negligence alleged in the present case had sufficient evidentiary support to withstand CSX's summary judgment motion. *Blair* therefore is easily distinguishable from the present case.

I would affirm the grant of summary judgment to CSX.

---

**16.** *Id.* at 604–05, 65 S.Ct. 545 (emphasis added).